JOSEPH T. HOWELL, Executor, etc., v. HUGH C. MOORE et al.

Middle Section.    June 11, 1930.

Judgment affirmed by Supreme Court, July 23, 1932.

Jno. J. Vertrees, Thomas H. Malone, J. Washington Moore and Edward J. Smith, all of Nashville, for plaintiffs in error.

Pitts, McConnico & Hatcher, of Nashville, for defendants in error.

FAW. P. J.   In the Circuit Court this case presented an issue of devisavit vel non, on certain "writings" propounded as the holographic will of John P. Farrelly. deceased.   At the close of all the evidence, the trial judge, on motion of the contestants, peremptorily directed the jury to return a verdict in favor of the contestants and "against the will sought to be set up," which was done, and the court thereupon adjudged that "the papers mentioned in the declaration and in the said motion of the heirs of John P. Farrelly,

Hugh C. Moore and others, are not, nor is anyone or any part of them, the last will and testament of the said John P. Farrelly.'' The Circuit Court further adjudged that the contestants recover of the plaintiff Joseph T. Howell, Executor (the proponent) all the costs of the cause in the Circuit Court and the County Court, for which executions were awarded; and the Clerk of the Circuit Court was directed to certify a copy of the judgment of the Circuit Court to the County Court of Davidson County to be entered on its minutes.

In due season, the proponent filed and presented to the court a motion for a new trial, specifically asserting error in numerous rulings of the trial court, including all those challenged by assignments of error in this court, but the motion for a new trial was overruled, and the proponent thereupon excepted to the action of the court in overruling his motion for a new trial, and prayed an appeal in the nature of a writ of error to this court, which was granted by the trial court and perfected by the plaintiff in error.

For convenience, we will hereinafter refer to the plaintiff in error as the proponent, and to the defendants in error as the contestants.

Numerous assignments of error have been presented here on behalf of the proponent, and the court has been aided by unusually able and exhaustive briefs and oral argument of counsel for the parties, respectively.

It appears, without dispute, that the contestants are the next of kin and heirs at law of the alleged testator, John P. Farrelly, deceased, and, therefore, had the right to contest his alleged will, as the persons who succeeded to his estate if he died intestate.

On August 26, 1921, seven separate ''paper writings'' were probated, in common form, in the County Court of Davidson County, Tennessee, as ''the true, whole and last will and testament of the said John P. Farrelly, and genuine codicils thereto,'' and it was ordered by the County Court that ''same be filed and recorded as such.''

Pursuant to a petition filed by the contestants in the County Court on November 29, 1921, with amendments thereto on January 30, 1923, and December 10, 1924, and proceedings had thereunder, the County Court certified to the Circuit Court of Davidson County the fact of the contest and the original ''paper writings'' theretofore admitted to probate as the will of John P. Farrelly, the said ''paper writings'' thus certified being described in the order of the County Court as ''the whole of said last will and testament, consisting of all the original instruments heretofore admitted to probate in common form as the last will and testament of the said John P. Farrelly.''

In the Circuit Court the proponent filed a declaration, by which he propounded for probate, as the last will and testament of John P. Farrelly, deceased, fifteen separate writings, eight of which had not been offered for, or admitted to, probate in the County Court.

We may say here that, in our opinion, the Circuit Court was without jurisdiction to probate, as a part of the will of John P. Farrelly, deceased, the aforesaid eight "writings" which had not been offered for probate, or probated, in the County Court. It is true that the jurisdiction of the Circuit Court to try issues made up to contest the validity of wills is original, as distinguished from appellate; but the jurisdiction of the County Court over the probate of wills is original, general and exclusive, and the Circuit Court has no jurisdiction in the matter of the probate of a will, unless the will has been first presented for probate in the County Court. Winters v. American Trust Co., 158 Tenn., 479, 485, 14 S. W. (2d), 740; Murrell v. Rich, 131 Tenn., 378, 397, 175 S. W., 420; Sizer's Pritchard on Wills, sections 43 and 313. In Lillard v. Tolliver, 154 Tenn., 304, 285 S. W., 576, both of the contesting wills had been offered for probate in the County Court.

However, the denial, on the ground just stated, of probate to the eight "writings" propounded, for the first time, in the Circuit Court, as aforesaid, will not, as we see the case, be material to the controlling issues or affect the result. This will, we think, become apparent from the further statement herein of the facts of the case, and we have directed attention to it at this point in order to indicate our reason for confining our consideration of the "writings" propounded as the will of John P. Farrelly to the seven "paper writings" offered for probate, and probated, in the County Court, when we shall presently come to set out herein the "paper writings" propounded and contested.

To the declaration of the proponent, the contestants filed a plea of the general issue, and, in addition, filed a number of special pleas, but the special pleas were, on motion of the proponent, stricken out, for the reason that, in the opinion of the trial court, all the defenses presented by the special pleas could be made under the general issue.

It will conduce to a better understanding of the controlling facts of the case to preface the statement of our views of the questions raised by the assignments of error with a recital of certain undisputed facts, of a biographical character, with respect to the alleged testator.

John Patrick Farrelly was born March 15, 1856, at Memphis, Tennessee. He was the only child of his mother. In his early childhood his father died, and his mother soon thereafter removed to Little Rock, Arkansas, taking him with her, and they lived in Little

Rock until he was about twelve years of age, when they went to the State of Kentucky, where he was a student for a time, first at Gethsemane and then at St. Mary's College. From St. Mary's he went to Georgetown University at Washington City, and thereafter, in August, 1873, entered a University in Belgium for a course of study. From Belgium he went to Rome, Italy, and there, after some further study and training, he was ordained a Priest of the Roman Catholic Church in the year of 1880. (From his early childhood, his education had been directed with the view of preparing him for the priesthood.)

Following his ordination as a Priest, Father Farrelly traveled for about two years in Egypt and the Holy Land, and served for about five years as assistant Priest at the Cathedral in Nashville, Tennessee, acting also during that time as Chancellor of the Nashville Diocese.

In the year of 1887, Father Farrelly again went to Rome, where he resided for twenty-two years, during which period he occupied the position of Spiritual Director of the American College at Rome.

In the year of 1909, while yet in Rome, Father Farrelly was appointed Bishop of Cleveland, and took up his residence in the City of Cleveland, Ohio, and resided there, in the discharge of his duties and the exercise of his functions as the Bishop of the Diocese of Cleveland, until his death, which occurred on February 12, 1921, as the result of an attack of pneumonia, while visiting in the home of a friend (Mrs. Bonneman) at Knoxville, Tennessee. His body was placed, for permanent burial, in the vault under the High Altar of the Cathedral at Cleveland, Ohio, with those of three other deceased Bishops of the Diocese of Cleveland.

An outstanding characteristic of Bishop Farrelly, emphasized in the record, was his love for his mother,—his solicitude for her comfort and welfare while she lived, and his devotion to her memory after her death. Mrs. Farrelly remained near her son while he was at school in Kentucky, and resided at Baltimore, Maryland, while he was at Georgetown University in Washington City. During his service as a Priest in Nashville (1882-1887), Mrs. Farrelly lived at a hotel in Nashville. In the year of 1888, Mrs. Farrelly went to Rome and resided there until her death in the year of 1902, and her body was permanently interred in a tomb in St. Lawrence Cemetery at Rome.

The "paper writings" offered for probate and probated (in common form) in the County Court of Davidson County and contested in this case, will now be set out in full, as it would be difficult to deal properly with some of the questions presented by the assignments of error without having in mind the form and contents of these "writings." They are identified in the record as exhibits to

the deposition of the proponent's witness W. A. Scullen, and, for the purposes of designation and identification, we will so refer to them, but will follow the sequence in which they appear in the order of probate in the County Court.

"Exhibit 'A.'

"Lucerne, Switzerland, January 5, 1900.

"Last will and testament of John P. Farrelly.

"In the name of the Father and of the Son and of the Holy Ghost, Amen. I, John P. Farrelly, a Priest of the Roman Catholic Church, son of John P. Farrelly and of Martha Clay Moore Farrelly, and a native of Memphis, Tennessee, in the United States of America, being in the full use of my mental faculties and in sound bodily health, do hereby will, devise and bequeath:

"1st. My two large copies from paintings by Murville Moore in the American College, Rome, Italy, and representing the Holy Family and the Immaculate Conception, to Rev. John B. Morris, Priest now residing in Nashville, Tennessee, for the Cathedral of said City of Nashville.

"2nd. My stereopticon and all its appurtenances, now in the said American College, Rome, to the said John B. Morris, for the use of the Roman Catholic schools of said City of Nashville.

"3rd. The contents of the large wardrobe belonging to me and at present in St. Joseph's Rectory in Nashville, Tennessee. Said contents consisting of candlesticks, a missal and other religious articles, to said John B. Morris, Priest, as aforesaid, for the Cathedral of Nashville, Tennessee.

"4th. My Ordination Chasuble, now in charge of Rev. Eugene Gazzo, Priest of St. Columbia's Church, Nashville, to the Cathedral aforesaid.

"5th. My box of books now in the basement of the Cathedral, Nashville, to the said Rev. John B. Morris, for his own use and disposal.

"6th. The trunk in the Cathedral basement aforesaid, and belonging to me, to Mrs. Kate Greer Moore, of Brentwood, Williamson County, Tennessee.

"7th. The trunk in St. Joseph's Rectory, belonging to me, to Mrs. Doctor James McKissac Moore, of Spring Hill, Tennessee.

"8th. The two engravings in aforesaid Rectory, viz.: the Way to Calvary and the Sacred Heart, the first to Joseph Burns, son of John M. Burns and Virginia Wrenne Burns, of Nashville. Tennessee, the second to John Burns, Joseph's elder brother.

"9th. My silver gilt chalice, with gems and cameos, to Rt. Rev. William H. O'Carrell, Rector of the American College, Rome, in behalf of said college, with the request that the inscription, 'In suffraginnis Animos, Marthae Clay Moore Farrelly, et Joannis filii ejus, sacerdotis,' with the datés of our deaths, be engraven upon it and my plain silver chalice to the said American College through the said Rector, and with the same request as to inscription.

"10th. I will my writing table and chair now in my room in the said American College, to Herman C. Huffer, of Paris, France (5 Avneue du coq).

"11th. I will my ancient copy of the Madonna by Bernardino Luini, in said room, to William J. Huffer, of Paris.

"12th. I will my bronze crucifix to Leo Huffer, of Paris.

"13th. I will my mahogany wardrobe to William H. O'Carrel, Domestic Prelate and Rector of the said American College.

"14. I will my copy of the Rimini Madonna to Daniel McMackin, now a student of the American College.

"15th. I will my engraving of the Crucifix and five sorrowful mysteries to Joseph Wilson, a student of the American College.

"16th. I will my ivory crucifix to Hugh A. O'Brien, student of the American College.

"17th. I will my Meagher photographic apparatus to St. Cecilia's Academy of Nashville, Tennessee.

"18th. I will my dressing case traveling bag now in the Hotel Goldener Sterm, Lucerne, Switzerland, to Mr. Jacob Butter, Barren Strasse, Zug.

"19th. I will my gold watch and chain to John F. Huffer, son of William J. Huffer, of Paris.

"20th. I will the ring attached to my watch chain to Bertha Huffer, daughter of H. C. Huffer, of Paris.

"22nd. I will my books, now in the American College, to the Rev. John B. Morris aforesaid.

"23rd. I will my valises and trunks, excepting that which I have willed to Jacob Butter, to Mrs. A. Brooks, of Brooks' Station, Bullitt County, Kentucky, and to the same I will my silk bed cover. She is to divide equally with her sister, Frances Moore Pendleton.

"24th. I will my two eastern rugs, now in the American College, to Right Rev. Denis O'Connell, now residing in Rome at 61 Viadel Trintone.

"25th. I will my silver watch to Atilis Lepu, a servant of the American College.

"26th. I will my correspondence to the Rev. John B. Morris, as I do also my collections of photographs.

"Done in Lucerne, Switzerland, January 5, 1900, and signed by me with my own signature.

"JOHN P. FARRELLY."

Exhibit "C."

"I add to my will the following: My two marble tabletops in my room in the American College, Rome, to Mary Huffer, daughter of Leo and Estelle Huffer, and to Elsa Huffer, daughter of William Huffer and Louis Huffer, all of Paris.

"Lucerne, January 5, 1900.

"Signed by me,

"JOHN P. FARRELLY."

Exhibit "E."

"Lucerne, Switzerland, January 5, 1900.

"I, John P. Farrelly do hereby express my will that my mother's last will and testament regarding the disposal of her property in Nashville real estate, and cash and bonds, be carried out to the letter, or to the very fullest extent feasible.

"JOHN P. FARRELLY."

Exhibit "F."

"My dear Friend:

"I give you the key of my prie-Dieu with the request that in case I write to you to such effect you will send me forthwith by registered mail and express this long envelope and the bunch of keys contained in the 2nd drawer of said prie-Dieu.

"Should any fatal accident befall both mother and me you will please send said envelope and keys to the Rev. John B. Morris, Cathedral, Nashville, Tennessee.

"The envelope contains mother's 'Will' and accounts. My own will is now in the hands of La Soeur Favre of the Kantonal Spital Lucerne.

"I desire that the said Rev. J. B. Morris act as executor together with Joseph T. Howell of Nashville, J. Vertrees and Herman C. Huffer, of Paris.

"Ever yours gratefully,

"JOHN P. FARRELLY,

"American College, Rome, January 24, 1900."

Exhibit "D."

"Codicils to My Will,

"May 1, 1905.

"(1) Instead of willing my gold watch and chain to John Burns of Nashville. Tennessee, I will said watch and chain to Abram Brooks, of Brooks Station, Bullitt County, Kentucky.

"I will my silver belt buckle to Mary Moore McCormick, of Shepherdville, Kentucky.

"JOHN P. FARRELLY.

"July 15, 1907.

"(2) I will my clock (silver alarm-clock) to Master John F. Huffer, of No. 5, Avenue du coq, Paris, France, and my three pairs of gold cuff-buttons to his sister, Miss Elsa Huffer, and my verascope to his brother, Dr. Edward Huffer.

"JOHN P. FARRELLY."

Exhibit "N."

"Sunday, July 12, 1896,

"Rome Via Tutoni 36.

"In the name of God, amen, I, Martha C. Farrelly being of sound mind and body do make this my last will and testament, revoking all former wills made by me at any time. After paying all my lawful debts should I owe anything at the time of my death, and my funeral expenses, I give and bequeath all my property real, personal and mixed wherever located or situated, wholly and entirely, without hindrance or qualification to my beloved son John P. Farrelly for his sole use and benefit forever —If my son, John P. Farrelly, should die without leaving a will, then I leave all my real estate to be incorporated to the City of Nashville for the purpose of founding an Asylum for nursing poor sick children who cannot be properly cared for at home. This charity is needed in every city but if the city of Nashville does not make use of this property immediately and forever for the purpose above stated—then I leave all my property personal and real to Rev. Father John Morris, Catholic Priest of Nashville, Tennessee, for the purpose of building a new Parish Church which is always needed in every large city. I request him to name the Church after St. John the Evangelist—and to make use of all the property both real and mixed to build the Church strong and substantial and in good taste. I make Father John Morris my Executor to carry out my will and testament to the letter without any outside influence whatever to the contrary. If the city keeps the property in good order and makes use of it for the purpose herein requested, then Father John Morris must take, and use the personal estate for the benefit and comfort of the children who are sick in this Asylum above mentioned. If Father John Morris should die without carrying out my last will and testament, I request him to appoint another gentleman in his place, who is honest and conscientious and courageous enough to carry out to the letter my last will and

testament, and I desire Father Morris to require him to give bond.

"I sign this my last will and testament.

"MARTHA C. FARRELLY.

"residing at present in Rome, Italy.

"MARY D. HART,
"MARIE Y. D. WALSH,
"AGNES C. WALSH."

(Then follows—as a part of Exhibit "N."—(1) the order or decree of the County Court of Davidson County, Tennessee, admitting the above quoted will of Martha C. Farrelly to probate, (2) the order of said County Court appointing John P. Farrelly, "the son and only child of the said Martha C. Farrelly," as Administrator of the estate of the said Martha C. Farrelly, deceased, with the will annexed, (3) the Letters of Administration, with the will annexed, issued to John P. Farrelly, (4) the inventory of the estate of Martha C. Farrelly, deceased, "a citizen of the United States of America, but for many years domiciled and residing at Rome, Italy," filed by John P. Farrelly, Administrator etc., and (5) the "settlement" of John P. Farrelly, administrator etc. in the County Court, all duly certified.)

It was stipulated on the record that each and all of the documents offered for probate, except Exhibit "N," were in the handwriting of the said John P. Farrelly, that his handwriting was generally known by his acquaintances, and that three or more credible witnesses, if summoned, would so testify.

It was also stipulated that said John P. Farrelly, "at the time of writing all the documents offered for probate as his last will and testament or codicils to the same, was of sound mind and memory and free from undue influence and so continued until his death."

With respect to the will of Mrs. Martha C. Farrelly, the mother of John P. Farrelly, a copy of which (Exhibit "N") was offered for probate as a part of the will of said John P. Farrelly, it was stipulated that neither said copy nor the original will of Mrs. Farrelly was ever in the handwriting of John P. Farrelly; and it was further stipulated that the typewritten copy (Exhibit "N") might be treated, for the purposes of this case, as though it were the original will in the handwriting of Mrs. Martha C. Farrelly.

Without intending to deal at this point with the question of whether the documents propounded for probate were found among the valuable papers of the testator, but merely for the purpose of further identification and description of these documents, it may be said that, according to the testimony of W. A. Scullen (the only witness who testifies on the subject), they (except the will of Mrs. Farrelly)

were found by him (Scullen), after Bishop Farrelly's death, in a tin box, known as a "dispatch box," which was in a drawer of a closet, known as the "forbidden closet," in the residence of Bishop Farrelly at Cleveland, Ohio.

The witness Scullen testified that Exhibits "A," "C," "F" and "D" were in envelopes, which envelopes, respectively, bore super-scriptions in the handwriting of Bishop Farrelly, as follows:

Exhibit "A" was in an envelope on which was written these words: "Last Will and Testament of John P. Farrelly. Consigned to Mon-seigneur Thomas F. Kennedy, Rector of the American College." This envelope was filed as Exhibit "A-1" to the deposition of W. A. Scullen.

Exhibit "C" was in an envelope which bore a superscription in these words: "Codicils to the Will of John P. Farrelly." This en-velope was filed as Exhibit "B" to the deposition of W. A. Scullen.

Exhibit "F" was in an envelope on which was written the words, "To be opened in case of accident to Rev. John P. Farrelly," below which the name "Reverend Edward Downes" had been written but crossed out, and underneath the latter was written, "Right Reverend Thomas F. Kennedy, American College Rome." This en-velope was filed as Exhibit "G" to the deposition of W. A. Scullen.

Exhibit "D" was in the envelope filed as Exhibit "B" to the de-position of W. A. Scullen, which, as before stated, contained Exhibit "C" and on which was written the words, "codicils to the will of John P. Farrelly."

It is not stated that Exhibit "E" was in an envelope, but Doctor Scullen states that it was tied up in the same package with the other papers propounded for probate, except the will of Mrs. Farrelly, Exhibit "N," which was found later in Bishop Farrelly's "safety deposit box" in the Fourth & First National Bank at Nashville, Ten-nessee.

To avoid confusion, it should be stated here that there are some discrepancies between the deposition of W. A. Scullen and the orgi-nal Exhibits brought up as a part of the record, with respect to the lettering for identification of said Exhibits, which appears from a comparison of Dr. Scullen's deposition in the transcript (particularly pages 283-287) with the identifying letters placed on the Exhibits by the Clerk of the Circuit Court in certifying said Exhibits as a part of the record. We have adopted the lettering of the Clerk on the original Exhibits, which seems to have been followed by counsel for the proponent in their brief.

We have set out in haec verba the "paper writings" filed as Ex-hibits "A," "B," "C," "D," "E," "F," "G" and "N" (ex-cept that only a part of "N" is copied) to the deposition of Dr.

W. A. Scullen, all of which were propounded for probate in the Circuit Court, but only Exhibits "A," "C," "E," "F," "D," and "N" (Exhibit "D" containing two separate purported codicils) were offered for probate and probated in the County Court.

In his declaration filed in the Circuit Court, the proponent propounded for probate, in addition to those heretofore specifically mentioned, six "paper writings" which were filed as Exhibits "H," "H-1," "J," "K," "L" and "M" to the deposition of W. A. Scullen.

Exhibit "H."

"This Exhibit is in the form of a letter in these words:

"Lucerne, Switzerland, January 5, 1900.

"My dear Herman:

"I am very sad after the two visits to my amiable mother this afternoon at 5 and this evening at 8 o'clock. When I told her that God himself would have to cure her poor arm. She said 'I can't expect it of him for myself, but I hope he will do it for you and your friends;' and she wept. When I told her I was so sorry I had to leave her, she said, 'I'm glad you are going, you need the change after such a long and dull time.' She was disappointed when I told her I was to be gone for two weeks. 'That is too short a time, I wish you would stay longer.'

"I expect to return Monday, two weeks. Not knowing what may happen to me on the journey, I write this evening my last will and testament which I will consign together with this to the sister who nurses mother in the Cantonal Hospital here, Sister Lefevre.

"In case I should die she will give it to Mr. Jacob Butter of Barrenstrasse, Zug., who will send it to you.

"Any expenses entailed upon you by executing the will are sure to be made good by T. Porter Weakley, Real Estate Office of Weakley & Shields, N. Cherry Street, Nashville, Tennessee, the same T. P. Weakley being mother's agent.

"Mother's will and the papers relating to her business affairs are to be found in the upper right hand drawer wall side of my writing desk, in my room in the American College, Rome, Italy.

"Should she die before me, I, as sole heir of the property, real and personal, mentioned in said will, desire that all the dispositions relating to her property mentioned in said will, be carried out to the letter, as she has expressed her desire that they should be.

"With every best wish for you and your dear ones I am always devotedly in Cht.

"John P. Farrelly.

"P. S. Should mother survive me I leave her to your care, Willie's and Leo's, all expenses to be paid by T. P. Weakley, and I beg you to see that the will she has made and to which I refer, be carried out with all due exactitude. All expenses incurred in these matters to be collected from the estate.

"As for Nashville executors I would recommend the appointment of Rev. John B. Morris of the Cathedral and Mr. Jos. T. Howell, and Lawyer Vertrees.

"John P. Farrelly."

Exhibit "H-1."

This Exhibit is an envelope in which the letter, Exhibit "H," supra, was found, and on which envelope (Exhibit "H-1") was written an address as follows:

"Monsieur Herman C. Huffer, 5 Avenue du coq, Paris."

Exhibit "J."

This Exhibit purports to be letter, reading as follows:

"Lucerne, January 5, 1900.

"Dear Mr. Butter:

"Should anything happen to me, that is, should I die or become physically or mentally incapable of attending to my affairs, please send the inclosed letters immediately to Mr. Herman C. Huffer of Avenue du coq 5, Paris, France.

"Every yours devotedly,

"John P. Farrelly."

Exhibit "K."

This Exhibit is an envelope in which the letter Exhibit "J," supra, was found, and on which envelope (Exhibit "K") was written an address as follows:

"Mr. Jakal Butter, Barrenstrasse, Zug."

Exhibit "L."

This Exhibit appears to be a vising card with the name of "Rev. John P. Farrelly" engraved thereon, and also with writing in the French language thereon which was translated by the witness W. A. Scullen as follows:

"The Rev. John P. Farrelly presents his compliments to the Good Sister Lefevre of the Cantonment Hospital at Lucerne and asks her in the case that he should die during his voyage or should be otherwise rendered incapable of taking care of his affairs she will consign this package to Mr. Jakal Butter, Barrenstrasse, Zug.

"John P. Farrelly."

All of the writing on this card (Exhibit "L") is in the handwriting of John P. Farrelly except the name, "Rev. John P. Farrelly," in the first line, which is engraved.

Exhibit "M."

This Exhibit is an envelope in which the card Exhibit "L," supra, was found, and on which envelope (Exhibit "M") was written an address as follows:

"Mr. H. C. Huffer, 5 Avenue du coq, Paris."

The "Official Will."

One of the contentions of the contestants is that Bishop Farrelly revoked all prior wills by a general revocatory clause in a witnessed will executed by him on September 11, 1909, known in the record as the "official will," which was duly probated as his last will and testament in the Probate Court in and for the County of Cuyahoga and State of Ohio on February 26, 1921. The order admitting said will to probate, including the will, is in the words and figures following, to-wit:

"THE LAST WILL AND TESTAMENT OF RIGHT REVEREND JOHN P. FARRELLY.

"THE STATE OF OHIO ) Civ. Doc. 151, No. 114848.
"VS.                ) ss.
"CUYAHOGA COUNTY ) In the Probate Court.

"Be it remembered that at a term of the Probate Court, within and for the County of Cuyahoga and State of Ohio, begun and held at the Court House, in the City of Cleveland, on the first day of January, in the year of our Lord, one thousand nine hundred and twenty-one, by and before Honorable Alexander Hadden, Judge of said Court, on the 26th day of February, A. D., 1921, being a day in said January, 1921, term of said court, there was duly filed therein a certain instrument in writing, purporting to be the last will and testament of Right Reverend John P. Farrelly, late of said County, deceased; and also an application to admit same to probate; which said application is in the words and figures following, to-wit:

"THE STATE OF OHIO, CUYAHOGA COUNTY, SS. IN THE PROBATE COURT. ESTATE OF Rt. Rev. John P. Farrelly, deceased.

"APPLICATION FOR PROBATE OF WILL. The undersigned hereby makes application for the admission to probate of the last will and testament of Right Reverend John P. Farrelly, late of the City of Cleveland, in said County, deceased, and on oath, states that said Right Reverend John P. Farrelly died on or about the 12th day of February, 1921, leaving the following named persons, his next of kin:

"Mrs. Mary Moore McCormick, cousin, Shepardsville, Ky.

"Sister Adelaide, cousin, Nazareth, Ky.

"William A. Scullen, Applicant resides at No. 1007 Superior Avenue, Phone Prospect 1081. Sworn to and subscribed before me by the said ————— this 25th day of February, 1921. Frank G. Mooney, Notary Public, (SEAL).

"And afterwards, to-wit: on the 2nd day of March, A. D., 1921, the testimony of James Nolan, one of the subscribing witnesses to said will, was duly taken in open court reduced to writing and filed.

"And afterwards, to-wit: on the 4th day of March, A. D., 1921, the testimony of Jno. A. Sidley, the other subscribing witness to said will, was duly taken in open court, reduced to writing and filed.

"Thereupon on the 9th day of March, A. D., 1921, being a day in said January, 1921, term of said court. The last will and testament of the Rt. Rev. John P. Farrelly, deceased, late of the City of Cleveland, in this County, having been presented to the court for probate and' record, and it appearing to the court that said decedent died leaving no widow surviving him, and that all the next kin of said decedent are non residents of the State of Ohio, and that the issuance of notice to them of the presentation of the said will for probate is unnecessary, and James Nolan and John A. Sidley, the subscribing witnesses to said will, having appeared in open court, they were duly sworn and examined according to law, as to the due execution and attestation of the said will, and their testimony was reduced to writing and filed. Whereupon, it appearing to the court from the testimony so taken, that said will was duly executed and attested, and that at the time of executing the same, the testator was of lawful age, of sound mind and memory and not under any restraint, the court now admits the said will to probate and orders that the same, together with the testimony so taken, shall be recorded as provided by law. Jour. 184, page 132.

"Which said Last Will and Testament is in the words and figures following, to-wit:

" 'In the name of Almighty God, the Father, Son and Holy Ghost, Amen.

" 'I, John P. Farrelly, of the City of Cleveland, Ohio, Bishop of the Catholic Diocese of Cleveland, do hereby make and publish this my last will and testament.

" 'Item I. I hereby give, devise and bequeath all the property, both real and personal, and wherever situated, that I hold as Bishop of the Diocese of Cleveland, unto Rev. Thomas C. O'Reilly, Rev. James O'Leary and Rev. Geo. F. Murphy, all

of Cleveland, Ohio, only until the installation, of my successor as Bishop of Cleveland, in TRUST only, however, to hold the title to the same, and manage and suffer the same to be managed as directed in such cases by the laws of the Roman Catholic Church, until such installation; and I direct that such trustees be not required to give bonds. In case of the disability or death of any of said trustees, his or their place shall be filled by the other trustees, or trustee.

" 'Item 2. I hereby give, devise and bequeath all the property mentioned in Item I of this will, to the person who may be installed as my successor, as such Bishop of said Catholic Diocese of Cleveland, this devise and bequest to vest in him at once upon such installation.

" 'Item 3. I hereby revoke all former wills by me made. In witness whereof, I have hereunto set my hand and seal at Cleveland, Ohio, this 11th day of September, A. D., 1909.

" ' (SEAL)              " 'John P. Farrelly,
                          " 'Bishop of Cleveland.

" 'Signed by the said John P. Farrelly, Bishop of Cleveland, in our presence and by him declared and published to each of us as his last will and testament, and signed by each of us as witnesses at his request and in his presence and in the presence of each other, this 11th day of September, A. D., 1909.

" 'James Nolan, residing at 2642 Superior Ave., Cleveland, Ohio.

" 'John A. Sidley, residing at 2692 Superior Ave., Cleveland, Ohio.

" 'Which said testimony is in the words and figures following, to-wit:

" 'THE STATE OF OHIO, CUYAHÓGA COUNTY, SS. IN THE PROBATE COURT, Testimony, in proof of the last Will and Testament, of Rev. John P. Farrelly, deceased, late of the City of Cleveland, in said County. We, James Nolan and John A. Sidley being duly sworn in open court, depose and say, that the said Testator signed the foregoing last will in our presence, and that he called upon us witness the same as his last will, and that we, in his presence, signed the same as such witnesses; and we on our oath further say, that the said Testator, at the time of executing said will, was of full age, of sound mind and memory, and was not under any restraint. James Nolan, John A. Sidley.

" 'Sworn to and subscribed before me, by James Nolan this 2nd day of Mar., 1921, H. W. Beckman, Deputy Clerk.

" 'Sworn to and subscribed before me, by John A. Sidley, this 4th day of Mar., 1921, H. W. Beckman, Deputy Clerk.' "

This will of September 11, 1909, was never probated or offered for probate in the County Court of Davidson County, Tennessee. On May 1, 1925, the County Court of Davidson County certified the fact of the contest of the alleged holographic will of John P. Farrelly to the Circuit Court as before stated, and thereafter, viz.: On October 2, 1925, the contestants filed a petition in the County Court of Davidson County, accompanied·by a copy of said will of September 11, 1909, and the record of its probate in Ohio, as aforesaid, all duly certified under the Act of Congress, in which petition the petitioners alleged that they did not know of the existence of said will of September 11, 1909, until it was disclosed by the deposition of W. A. Scullen, taken on behalf of proponent since the fact of the contest of the alleged holographic will had been certified to the Circuit Court. In their said petition, the contestants asserted that they had the right to present and urge the revocation of said holographic will by the subsequent will of September 11, 1909, "as an additional ground for the contest and setting aside of the probate of said ·alleged holographic will and alleged codicils," and they prayed that the County Court "order and declare petitioners' right to contest said holographic will and alleged codicils of John P. Farrelly on the ground of their revocation by the said subsequent will of September 11, 1909," and that the County Court "direct the certification of this contest to the said Circuit Court, to the end that this application and the ground here presented may be there heard and considered along with the case now pending in said court, for all purposes within the jurisdiction of said Circuit Court."

Joseph T. Howell, Executor, etc., demurred to said petition on the ground, in substance, that, the contest having been removed to the Circuit Court, it was no longer within the jurisdiction of the County Court for any purpose. The demurrer was sustained and the petition dismissed, whereupon the petitioners prayed an appeal to the Circuit Court, which was granted by the County Court and perfected by the petitioners.

In the Circuit Court, the case thus brought to that court by the aforesaid appeal of the petitioners was, by consent, heard together with the case certified for the trial of the issue of devisavit vel non.

On the trial below, the parties, through their counsel, stipulated, in writing, as follows:

"That as a matter of fact, James Nolan and John A. Sidley, subscribing witnesses to the will of said John P. Farrelly, Bishop of Cleveland, of September 11, A. D., 1909, and who, as such witnesses, proved said will in the Probate Court of Cuyahoga county in the State of Ohio, by their testimony given in said Probate Court on March 2nd and March 4, 1921, as shown by a copy of said will and record of probate proceedings

in said court, certified under the Act of Congress, on July 17, 1925, filed as Exhibit 'A' to the petition of Hugh C. Moore and James M. Moore et al., in the County Court of Davidson county, Tennessee, on October 2, 1925,—would, if examined as witnesses, testify and prove on oath that they were present and witnessed the signing and publication by the said John P. Farrelly, Bishop of Cleveland, of the will executed by him on September 11, A. D., 1909, in the City of Cleveland and County of Cuyahoga, Ohio, as stated and shown on the face of said will, and that the said testator, John P. Farrelly, Bishop of Cleveland, signed said will in the presence of said two witnesses, James Nolan and John A. Sidley of said State and County, and that the said John P. Farrelly called upon said two witnesses to witness the same as his last will, and that said two witnesses, in the presence of the said John P. Farrelly, signed said will as such witnesses, and that the testator, at the time of the execution of said will, was of full age, of sound mind and memory and was not under any restraint.

"It is further stipulated that the testimony of the said James Nolan and John A. Sidley, subscribing witnesses to the said will of John P. Farrelly, Bishop of Cleveland of September 11, 1909, as said testimony was reduced to writing and filed in the Probate Court of Cuyahoga County, Ohio, as shown in the certified copy of said proceedings in said court, which was filed as Exhibit 'A' to the petition of Hugh C. Moore et al. v. Jos. T. Howell, Exr., in the County Court of Davidson County, Tennessee, on October 2, 1925, may be read and used in said contest and litigation with the same effect as though said testimony had been copied into the face of the probate decree entered in the said Probate Court of Cuyahoga County, Ohio, in Jour. 184, page 132, of said court, appearing in said certified copy of said proceedings in said court, which was filed as Exhibit 'A' to the petition of Hugh C. Moore et al. v. Jos. T. Howell, Extr., in the County Court of Davidson County, Tennessee, on October 2, 1925, as aforesaid.

"That this stipulation, made for the purposes aforesaid, may be read in evidence in said contest and litigation instead of calling said two subscribing witnesses, with the same probative effect as though said two witnesses had been examined in person, or by depositions, and had testified as stated above."

In the course of the trial, the contestants offered said will of September 11, 1909, in evidence, and also moved the court to be allowed to probate it, and to have an order of probate then entered in the Circuit Court setting up and probating said will, on the basis and foundation of the copy of said will and the probate decree and

614

proceedings thereon had in the Probate Court of Cuyahoga County, Ohio, certified under the Act of Congress, and the aforesaid stipulation of the parties which had been theretofore filed and read; whereupon, the proponent objected to the introduction of the "so-called official will and probate," and objected "to the testimony of these witnesses (James Nolan and John A. Sidley) set out in the stipulation, on that subject, as to the competency and relevancy of it, because that is merely what they would testify if present."

The grounds of proponent's objection were then stated as follows: (1) said will was never probated or offered for probate in the County Court of Davidson county, and, therefore, cannot be offered in the Circuit Court; (2) the Circuit Court is not a Court of original probate jurisdiction; (3) said will "shows on its face that it only relates to official property, it is made by him (John P. Farrelly) in his official capacity, signed by him in his official capacity, and is irrelevant as a circumstance and has no bearing on his personal will," and (4) that (insofar as the probate and other proceedings are offered on the question of domicile) domicile is a question this court has no jurisdiction over whatever, and this is a collateral attack on the administration proceedings which have been begun; that the only way now counsel can proceed in such case is to move to revoke the letters of probate, if they have been wrongfully issued, and an appeal of that case to the appellate court and not to the Circuit Court.

The trial court ruled that the said will of September, 1909, would be "admitted for evidentiary purposes," but denied and overruled the motion of the contestants to have said will admitted to probate in the Circuit Court.

The ruling of the trial court admitting said will of September 11, 1909, "for evidentiary purposes" is made the basis of assignments of error by the proponent in this court, but the contestants made no motion for a new trial below and did not appeal, hence the action of the trial court in refusing to admit said "official will" to probate is not now open for review.

Exclusion of Mrs. Farrelly's will.

The trial court admitted to the jury all of the exhibits to the deposition of W. A. Scullen which have been hereinbefore mentioned, except Exhibit "N" (the will of Mrs. Martha C. Farrelly, together with the record of the probate thereof, administrators' settlement, etc., as copied in a preceding part of this opinion), which the court, on objection by the contestants, declined to admit in evidence, but which, in the absence of the jury, was made a part of the record for the purposes of review.

The ruling of the trial court excluding the will of Mrs. Farrelly is vigorously assailed, as erroneous, by counsel for proponent. If this ruling is sustained, it is practically determinative of the case; hence, we deem it proper to quote certain record recitals of the proceedings below when Exhibit ''N'' was offered and objection thereto was made, in order that the nature of the question arising thereon and the precise contentions of the parties, respectively, may be clearly understood. These recitals (in the bill of exceptions) are as follows:

''Thereupon, in the absence of the jury, Mr. McConnico proceeded with an argument at length in support of the objection made by counsel for the heirs of John P. Farrelly, which objection made and presented the specific question that, under the Tennessee statute authorizing holographic wills, it was not competent nor permissible for the will of Bishop Farrelly's mother not in his handwriting to be proved as a part of Bishop Farrelly's holographic will for the purpose of having same incorporated by reference into Bishop Farrelly's holographic will, when it appeared that the said will of his mother, which it was sought to introduce in evidence, was itself a holographic will, which had been probated as such, and which under the stipulation already read to the court it appeared had never been in Bishop Farrelly's handwriting at all.

''During the course of Mr. McConnico's argument on said preliminary question made by the heirs of John P. Farrelly, that as a matter of law in Tennessee, under the Tennessee statute relating to holographic wills, it was not competent or permissible to prove for the purpose of incorporating by reference into Bishop Farrelly's holographic will the document which was Exhibit ''N'' to the deposition of Dr. Wm. A. Scullen, which was a certified copy of the will of Mrs. Martha C. Farrelly, dated June 12, 1896, together with the probate thereof, administrator's settlement, etc.,—the following occurred:

''Mr. Malone: Is there any point made on the fact that we are presenting here before the jury, a certified copy and not the original document from the County Court Clerk's office?

''Mr. McConnico: No, I am entirely willing if counsel wants to, now to stipulate, if that will expedite the matter, that counsel can produce, and were it not for this stipulation would have the original will of the mother, in her handwriting brought up and offered and, that, as far as that would go in the document in question, that I am objecting to may be regarded as done. But I understand Mr. Malone's Exhibit ''N'' to Dr. Scul-

len's deposition includes more than the will, it includes the settlement and all that, in the County Court.

"Mr. Malone: Yes, the Exhibit includes the settlement and the decree of probate.

"Mr. McConnico: Now, do I understand,—I am trying to accommodate and be as informal as I know how to be and let you make any question you want to make in the shortest way—

"Do I understand you are offering the original will of his mother and then the remainder of the document that is incorporated in Dr. Scullen's Exhibit "N." I am entirely willing that that be offered by you without physically bringing up and identifying the holographic will of the mother. Does that meet the situation, Mr. Malone?

"Mr. Malone: Of course we cannot offer the probate of the will as part of the document that Bishop Farrelly meant to incorporate at the time he wrote his will, because his mother was not then dead, and there had not been any probate.

"Mr. McConnico: I understand that.

"Mr. Malone: That is offered for other purposes, as showing the probate, and for evidentiary statements in the probate decree. What we are offering now in connection with the probate is the mother's will which we insist was then in Bishop Farrelly's possession and is the will referred to, and we are offering this certified copy in lieu of the original will.

"Mr. McConnico: If I understand counsel, it is stipulated, and let us see if I get it—it is your insistence that Bishop Farrelly undertook to incorporate in his will the original will of his mother.

"Mr. Malone: By reference, yes.

"Mr. McConnico: That original will is the document you insist was incorporated by him, by reference?

"Mr. Malone: Exactly.

"Mr. McConnico: And that original will is the document you could bring up and offer to prove as the document which is incorporated, by reference, by Bishop Farrelly?

"Mr. Malone: That is correct.

"Mr. McConnico: I am willing to stipulate that you have done that and that the original will of Mrs. Farrelly is now offered in its original form, in her handwriting, as the document that Bishop Farrelly, under the contention of counsel, was incorporating, and, under the contention of counsel, did incorporate in his will that night and that is the original document in her handwriting that is now offered here as the will claimed incorporated by reference. I am stipulating that.

"I then understand counsel is producing the certified copy accurately to carry the history of what happened about the probate of his mother's will and settlement of the estate of his mother?

"Mr. Malone: And to further show, by the recitals therein, that that will was never out of his possession. That is an adjudication in that case and for any other evidentiary purposes that the recitals in the probate may have.

"Mr. McConnico: Of course we would object to evidentiary facts in that, because it would have no higher value than oral testimony, but we need. not argue that question now. But, I merely aim to understand, and I think I do, that counsel will hereafter state, on their side, all the purposes for which he offers the Exhibit "N" to Dr. Scullen's deposition but I understand we have merely this stipulation, that the original of the will of his mother, in original form, is now offered in evidence, and is the will which counsel insists was incorporated by Bishop Farrelly and which counsel is insisting is to be regarded as inporated in his will.

"Mr. Malone: That is right, and further, my understanding is that for convenience, we may read from Dr. Scullen's Exhibit "N" the certified copy of the mother's will without bringing up the original here physically before the jury.

"Mr. McConnico: That is true. I also understand counsel is offering to prove this entire file containing Dr. Scullen's Exhibit "N" as having been and as now being incorporated in Bishop Farrelly's will?

"Mr. Malone: No, I don't understand we are attempting to prove that.

"Mr. McConnico: It was so probated in the court below.

"Mr. Malone: It was probated, but it was one document; it was probated as one document and the primary purpose there was to get the mother's will in and to show that Bishop Farrelly preserved this copy of his mother's will among his valuable papers, this certified copy.

"Mr. McConnico: Then, as I understand it is not sought to propound or probate as part of Bishop Farrelly's will, the decree of probate of his mother's will and settlement of all matters by him of his mother's estate in the County Court.

"Mr. Malone: No, that is not attempted and I think you will see the declaration says there, certified copy of the will of Martha C. Farrelly.

"Mr. McConnico: No, your declaration says: 'Certified copy of will of Martha C. Farrelly with the probate thereof.' Then,

618

as I understand and I am only tedious about it now so we will not hereafter have any misunderstanding about it, that the only document, that is to say, that the original of Mrs. Martha C. Farrelly's will, in her own handwriting is the document, the physical document, that is sought to be probated as part of Bishop Farrelly's will?

"Mr. Malone: That is so, and for convenience, certified copy will be read to the jury.

"Mr. McConnico: As though it was the original, which it is stipulated, was in her handwriting.

"Question further argued by Mr.. McConnico, until adjournment of court."

On a later day (the jury having been respited in the meantime) the ruling of the court was announced and other proceedings had (in the absence of the jury) as follows:

"The Court: The legal question raised, gentlemen, in the objection of counsel in the reading of the deposition has been argued at great length and very ably argued on both sides. The court has listened with great interest to the presentation of the question and read the briefs furnished by counsel, and after consideration of the question, I am constrained to sustain the objection, based, as I see it, on the plain letter of the statute, the plain wording of the statute and cases which I think sustain that holding.

"Mr. Malone: Of course, Your Honor will permit us the benefit of an exception to your Honor's ruling.

"The Court: Yes, note your exception.

"Mr. Malone: I would like Your Honor to state just what the effect of Your Honor's ruling is, as you understand it, on this proof.

"The Court: It is to sustain the objection of counsel to the reading of the will, of Mrs. Farrelly. That is the objection made, and that is the only question I was called on to decide.

"Mr. Malone: That means, the mother's will cannot be read to the jury in this case, but we can go ahead and prove. the factum of Bishop Farrelly's will, and whether that was found among his valuable papers.

"The Court: Yes.

"Mr. Malone: Now, we wish to offer the probate of this will as shown in the certified copy, in fact the certified copy, shows the whole record of the proceedings in the county court with regard to the mother's will, including the settlement of the executor.

"Now, we offer that record next, and we offer it to show that the mother's will was in fact probated and for any other evi-

dentiary purpose that may have a bearing on the issues in this case, and among the questions on which we think this has a bearing is the question of identification.

"We want to make up our record, of course as Your Honor sees, for the Supreme Court, and one of the matters that will come up will be the question of identification, for our adversaries insisted in the recent long argument that even if a holograph can incorporate extraneous documents the document in this case has not been sufficiently identified. Now, we offer the probate of the mother's will to show that Bishop Farrelly died nearly twenty years after his mother with this holographic will in effect which speaks under our statute as if made just the minute before his death, and that the mother's will was then probated and a public record here in Davidson County, and that was proved as a holograph in the custody and lodged with another for safe-keeping, and we offer that in rem proceeding in the county court as the best evidence of the probate of the mother's will and the proceedings had thereunder.

"Mr. McConnico: May it please the court, in order that all the questions of counsel may be preserved, we will now stipulate that counsel has offered to prove all those things. Of course, if the mother's will by the holographic statute, that is, under the holographic statute, cannot be probated as part of Bishop Farrelly's will by virtue of the language of that statute, it is immaterial whether it has been sufficiently identified,—if it could not be proven.

"The Court: Let the record show, that the record in that case, which shows the probate of Mrs. Farrelly's will, has been offered in this case, as insisted upon by Mr. Malone. Objection is made and objection is sustained, to which you may note your exception.

"Mr. Malone: Yes, our exception is noted.

"Jury thereupon returned to the room."

Ohio Law.

A written stipulation of the parties was filed and read to the jury below by which it was agreed as follows:

"That on the 11th day of September, A. D. 1909, and prior thereto, and continuing on through the year 1921, no holographic will was permitted or valid under the law of said State of Ohio; and this was true, both with respect to wills of real estate and of personal property, in said State."

Estate of John. P. Farrelly.

John P. Farrelly was the owner of a valuable personal estate, and also the owner of valuable real estate situated in the City of

Nashville, Davidson County, Tennessee. It was therefore necessary, insofar as his personal estate was involved, to ascertain where he was domiciled at the time of his death, for "it is a clearly established rule, that the law of the country in which the deceased was domiciled at the time of his death not only decides the course of distribution or succession as to personalty, but regulates the decision as to what constitutes the last will without regard to the place either of birth or death or the situation of the property at that time." 2 Woerner on Administration (3 Ed.), sec. 226, p. 758. See also Idem, sec. 51, p. 142.

But, as to real property, the validity, operation and effect of a will are governed by the lex situs. Kirkland v. Calhoun, 147 Tenn., 388, 393, 248 S. W., 302; Jacobs v. Willis' Heirs, 147 Tenn., 539, 545, 249 S. W., 815; McGinnis v. Chambers, 156 Tenn., 404, 408, 1 S. W. (2d), 1015.

"As to immovable property, the rule is that the lex rei sitae governs as to the capacity or incapacity of the testator, the extent of his power of disposition, and the forms and solemnities necessary to give the will its due authority and effect." Carpenter v. Bell, 96 Tenn., 294, 295, 34 S. W., 209.

"The place where a will happens to be made is not significant in legal effect," and it may be probated in any State where the testator owned land at the time of his death. Jacobs v. Willis' Heirs, supra, p. 545.

"Under a technical rule of the common law, no real estate could pass by a will of which the testator was not the owner at the time of its execution" (3 Woerner on Administration (3 Ed.), sec. 419, p. 1390); but in Tennessee, under Shan. Code, sec. 3927, a will speaks and takes effect (in reference to the real and personal estate comprised in it) as if it had been executed immediately before the death of the testator, and conveys all the real estate belonging to him or in which he had any interest at his decease, unless a contrary intention appear by its words and context.

In Tennessee there is no statute on the subject of wills of personalty, hence the common law is applicable to them, and it follows that a will inoperative to convey real estate for the want of the requisite formalities may be good to bequeath personal property. 1 Woerner (3 Ed.), sec. 42, p. 111; Orgain v. Irvine, 100 Tenn., 193, 199, 43 S. W., 768; Reagan v. Stanley, 11 Lea, 316, 325; McLean v. McLean, 6 Humph., 451, 453-4.

In order that a will may be good and sufficient to give and convey lands in Tennessee, it must conform to the requirements of one or the other of two sections of the Code (2162 and 2163), which sec-

tions are carried into Shannon's Annotated Code as sections 3695 and 3696, and read as follows:

"3695. No last will or testament shall be good or sufficient to convey or give an estate in lands, unless written in the testator's lifetime, and signed by him, or by some other person in his presence and by his direction, and subscribed in his presence by two witnesses at least, neither of whom is interested in the devise of said lands."

":3696. But a paper writing, appearing to be the will of a deceased person, written by him, having his name subscribed to it, or inserted in some part of it, and found, after his death, among his valuable papers, or lodged in the hands of another for safe-keeping, shall be good and sufficient to give and convey lands, if the handwriting is generally known by his acquaintances, and it is proved by at least three credible witnesses that they verily believe the writing, and every part of it, to be in his hand."

Sections 3695 and 3696, supra, are codifications of two North Carolina statutes enacted in the year of 1784—one in April and the other in October—and the preamble to the later Act indicates that it was intended as in the nature of an exception to the former Act. In the case of McCutchen v. Oehmig, 1 Baxt., 390, 394-8, the court commented on the history and proper interpretation of sec. 3696, supra, as follows:

"The original statute from which the provision was brought into the Code was enacted in 1784, and was an innovation upon the prior statute of the same year, which regulated the disposition of land by last will and testament. The power to dispose of personalty by will is of immemorial existence at common law, and it is frequently said that no act requires less of ceremony and formality. But the power to devise lands was of statutory origin, and only existed in England after the Act of 27 Hen., VIII, and the reason was that land could not be transferred without the consent of the king or the superior lord, and a fee was paid for his consent to such alienation. The will, moreover, could not be known until after the testator's death, and, possiby the devisee was the mortal enemy of the feudal lord, who could not permit such a tenant to be imposed upon him. And instances are given in the ancient books of the authority to make a will being conferred upon particular persons by the king. Thus Edward III gave such a power to his son, the Black Prince. The Act of April, 1784, ch. 22, par. 11, regulating and prescribing the forms and ceremonies necessary to a devise of lands, recites that such an Act should be 'the most solemn and best considered

of a man's life,' and provides that 'no last will and testament shall be good or sufficient, either in law or equity, to convey or give any estate in lands, tenements or hereditaments, unless such last will shall have been written in the testator's lifetime and signed by him, or some other person in his presence and by his direction, and subscribed in his presence by two witnesses at least, no one of which shall be interested in the devise of the said land.' There were, however, particular cases not reached by this statute, and which, on account of the ceremony and solemn deliberation with which such wills were prepared, were deemed sufficient for the devise of the lands, and these were provided for by a subsequent statute of the same year, enacted in October thereafter. Vid. Acts, April and October, 1784, ch. 22; 10 C. & N., 706, 707. The preamble to the latter Act recites that the attestation of witnesses to wills and testaments required by the Act of April, 1784, ch. 22, is intended to prevent frauds and impositions by the will of persons hastily drawn up in their last sickness, and from their want of sufficient knowledge for that purpose, and it may be proper to make exceptions from that rule in particular cases; then follows the provision already cited for holographic wills, only differing from the provisions already cited from the Code in this, that the original Act refers to 'any will that shall be found among the valuable papers of the deceased or lodged in the hands of any person for safe-keeping,' and the Code refers to 'any paper writing appearing to be the will of the deceased, so found or so lodged as aforesaid, for safe-keeping. It will be observed that this latter act involves a material departure from the original provision for the devise of real estate, but that it is hedged and guarded in a manner to show that no serious departure was intended from the solemn sanctions and evidences of the animus testandi prescribed in the original statute, and this court had occasion to announce at an early day, that any construction tending to weaken the force of the provisions for the due and solemn execution of last wills as prescribed in the statutes, is inadmissible.' 1 Yerg., 407. It is no objection to the script in question as a will, that it is written in the shape of a letter, if it have the other requisites of a holographic will. What are these requisites as applied to the case in judgment? It must appear to be a will, and this requisite may be supplied by any words that unequivocally show that the writer intended it as a posthumous disposition of his estate, both real and personal, or that he intended by it to dispose of his personalty alone. For it is a question of intention at last, and the court and jury are to determine whether it be a will as to both

species of property, or a will as to either. But the first and paramount question is, whether it be a will at all under the statute. And first, it must appear that it was written by the deceased, and his name subscribed by him to it, or inserted in some part of it, and the hand-writing must be generally known among his acquaintances, and it must be proved by at least three credible witnesses that they verily believe the writing, and every part of it, to be his. In the case of Outlaw v. Hurdle, 1 Jones (N. & C.) R., 150, it was held under a like statute, that to entitle a holographic will to probate, the hand-writing of the deceased should be so generally known as to preclude the attempt to establish a fabricated will. That it is 'generally known' may be inferred from its being testified to by a large number of witnesses. 1 Jones R., 150. Although we may suppose a case in which such a paper may be lodged with some person for safe-keeping as a will, or found among his valuable papers after death, and yet his hand-writing be utterly unknown to any of his acquaintances, yet we can scarcely see how this very important provision of the statute can be dispensed with. But it must be lodged in the hands of another for safe-keeping. These words, as used in the statute, are of strong significance. The statute is providing for such cases of a devise of lands as lack the attention of witnesses, and substitutes the several requirements therefor, neither of which can be dispensed with. There must be a depository for the paper writing, and it must be so lodged and deposited as a will, and for safe-keeping as such, and of this deposit and lodgment there must be affirmative and positive proof. No mere inference or conjecture of the intention of the writer in such case can answer the requirements of the statute. Thus it was held that there must be affirmative and direct proof that the paper was deposited with some one as a will. St. John's Lodge v. Callendar, 4 Ired. R., 335. All the requisites of the statutes must concur, and it must appear that the writer, in lodging the paper with another, had in view its preservation as a will. 11 Hum., 377; Id., 465; 2 Head., 302; 5 Cold., 129. The mere writing of a letter to another, containing testamentary provisions, without affirmative and direct proof that the writer intended to lodge it with his correspondent as a will and for safe-keeping, would not answer the demand of the statute. In the language of this court already cited, 'all the requisites of the statute must concur.' ''

Our statute relating to holographic wills seems to be peculiar to Tennessee and North Carolina. Remsen on Preparation and Contest of Wills, pp. 19-20.

"In a few of the States holographic wills are expressly recognized, following usually the Louisiana Civil Code on this subject, but in some instances originating in the Old English Colonial Law. The holographic will, under said statute, dispenses with subscribing witnesses and the usual proof of a formal execution; but these Codes require it to be entirely written, dated, and signed, by the testator's own hand. His handwriting being proved, the will becomes legally established. The Tennessee and North Carolina Codes guard such a will with still greater caution in some respects; the writing must come from unsuspected custody for safe-keeping or be found among the testator's valuable papers, in order to be thus privileged. Such statutes are usually mandatory as to the formality prescribed, so far as the local jurisdiction is concerned." Schouler on Wills, etc. (5 Ed.), sec. 255.

See also Note to the case of Re Will of W. T. Jenkins (N. C.), 37 L. R. A. (N. S.), p. 842 et seq., digesting the North Carolina and Tennessee cases on holographic wills.

"The requirements of this statute (Shan. Code, sec. 3896) are equally important and necessary to be proven in order to sustain a holographic will." Brogan v. Barnard, 115 Tenn., 260, 262, 90 S. W., 858.

"Several testamentary papers and codicils may together constitute the last will of the testator, and should all receive probate together, as constituting one will." Woerner on Administration (3 Ed.), sec. 222, p. 749, and sec. 227, p. 769.

"Whatever number of wills the deceased may have executed after the date of a holographic will, the keeping it deposited among his valuable papers amounts to a republication at his death in the absence of any other will, or in the event of the spoliation of a subsequent will." Allen v. Jeter, 6 Lea, 672, 676.

But it must appear that the "paper writing" was preserved by the writer (either among his valuable papers or lodged in the hands of another for safe-keeping) "with the intent that it should operate as his will." 1 Woerner (3 Ed.), sec. 43, p. 113, note 1; Hooper v. McQuary, 5 Cold., 129; Crutcher v. Crutcher, 11 Humph., 464, 466.

When the things prescribed by the statute (sec. 3696, supra), are done, a holographic will is of the "same dignity" as a witnessed will. Marr v. Marr, 2 Head, 303, 308.

Bearing in mind the controlling statute (Shan. Code, sec. 3696, supra) and the general principles governing its construction and application which we have pointed out, we will next take up more directly the questions presented by the proponent's assignments of error.

It should also be remembered that the Circuit Court had power and jurisdiction to probate only seven of the fifteen documents or "writings" propounded for probate by the proponent in his declaration, for the reason that eight of the fifteen "writings" thus propounded in the Circuit Court were not probated or offered for probate in the County Court, and, as insisted by proponent's counsel (in stating his objection to the probate of the "official will") at the trial below, "the Circuit Court is not a court of original probate jurisdiction."

We do not mean to be understood as holding, by the ruling just stated, that the "writings" mentioned in proponent's declaration that had not been probated or offered for probate in the County Court were, for that reason, not admissible as evidence on the trial in the Circuit Court. These "writings" were filed as Exhibits "A-1," "B," "G," "H," "H-1," "J," "K," "L" and "M" to the deposition of W. A. Scullen, and, although not probatable in this case, were properly admitted to the jury as competent evidence, mainly for purposes of identification. McCutchen v. Oehmig, 1 Baxt., 390, 393, 398; Warwick v. Warwick (Va.), 6 L. R. A., 775; Re Manchester (Calif.), L. R. A. **1917D, 629.**

Eliminating, as not probatable in the Circuit Court, the "paper writings" not offered for probate in the County Court, as aforesaid, the "writings" propounded in the Circuit Court were Exhibits "A," "C," "D," "E," "F," and "N" to the deposition of W. A. Scullen. Exhibits "A," "C" and "D" are clearly testamentary in form, and, at the time they were signed by John P. Farrelly, were manifestly intended by him as testamentary dispositions of specific articles of his personal property.

Exhibit "F" is a letter dated January 24, 1900, and signed by John P. Farrelly, which was enclosed in an envelope addressed to "Right Reverend Thomas F. Kennedy, American College, Rome," and in which the writer states where his will and that of his mother may be found, and gives instructions with reference to the disposition to be made of same "should any fatal accident befall" both his mother and himself. In the last paragraph of this letter, the writer says: "I desire that the said Rev. John B. Morris act as executor together with Joseph T. Howell, of Nashville, J. Vertrees and Herman C. Huffer, of Paris." This letter, Exhibit "F," is of a testamentary character to the extent, and only to the extent, that it purports to nominate executors. 40 Cyc., p. 1078; Schouler on Wills, etc. (5 Ed.), sec. 294; 23 Ency. of Law (2 Ed.), pp. 118-119.

But whether Exhibits "A," "C," "D" and "F," although testamentary in character, are entitled to probate herein as the last will and testament of John P. Farrelly, or any part thereof, depends upon matters which will be presently considered.

Exhibit "E" is the "writing" frequently referred to in the record and briefs as "the little script of January 5, 1900," or simply as "the little script," which "with Exhibit 'N,'" (the latter being the will of Mrs. M. C. Farrelly) is the "storm-center" of this lawsuit,—it being contended for the proponent that Mrs. Farrelly's will, Exhibit "N," was "incorporated by reference" in the "little script of January 5, 1900," and was, for that reason, probatable as a part of the will of John P. Farrelly. However, it will be recalled that in the course of the trial below (as disclosed by the excerpt from the bill of exceptions hereinbefore quoted), the proponent, through his counsel, withdrew his offer to probate, as a part of John P. Farrelly's will, the decree of probate, etc., of Mrs. Farrelly's will, but sought to introduce the same in evidence before the jury "for other purposes, as showing the probate, and for evidentiary statements in the probate decree."

At the close of all the evidence, the proponent, through his counsel, moved for a directed verdict as follows:

"Mr. Malone: Now, we ask the court to direct a verdict in favor of the executor in this case, first, as to all of the documents submitted for probate; and second, in any event and under any view of the evidence as to the testamentary disposition of January 5, 1900, relating to the mother's property which, as we insist under the uncontradicted evidence constitutes a disposition of Nashville real estate by the testator, valid and binding whether his domicile be in Ohio or in Tennessee and which is unrevoked by any subsequent will."

Thereupon, and before the court ruled on the aforesaid motion of the proponent, the contestants moved for a directed verdict in their favor, their motion being as follows:

"Now, at the close of all the evidence in this case, come Hugh C. Moore and the other heirs and next kin of John P. Farrelly, deceased, and move the court peremptorily to instruct the jury to return a verdict that the certain paper writings produced in open court by Jos. T. Howell, alleging himself to be the executor of the said John P. Farrelly, deceased, and alleged by him as such executor to constitute the last will and testament of the said John P. Farrelly, deceased,—which said paper writings, as stated and set out in the declaration of said alleged executor filed herein on Feb. 28, 1928, are alleged and stated to be as follows: (Here follows an enumeration of the several paper writings propounded in the declaration), are not, and none and no part of said paper writings constitute, the last will and testament of the said John P. Farrelly, deceased."

Following the practice established in this State (Hardware Co. v. Hodges, 126 Tenn., 370, 378, 149 S. W., 1056, 1058; Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn., 551, 557, 249 S. W., 984), the trial court acted upon each of said motions separately—first overruling the motion of the proponent and then sustaining the motion of the contestants—undertaking to dispose of each of the motions upon its own merits without reference to the other.

The first assignment of error in this court is that the trial court erred in overruling the motion of the executor, made at the close of all the evidence, for a directed verdict.

As a matter of course, if the "official will" of September 11, 1909, revoked all former wills of John P. Farrelly, as claimed by the contestants, the proponent's motion for peremptory instructions .was properly overruled. But laying that question out of view for the present and leaving it for consideration in another connection, we are of the opinion that, upon other grounds, the proponent's motion was properly overruled. The proponent was not entitled to have the jury peremptorily instructed to return a verdict in his favor unless it appeared from undisputed evidence, not susceptible of any other reasonable inference, that the "paper writings" propounded for probate appeared to be the will of John P. Farrelly; that they were found after his death among his valuable papers, and that (insofar as his personalty was involved) he was not domiciled in the State of Ohio at the time of his death.

It is too clear to need discussion that there is much evidence tending to show that the legal domicile of John P. Farrelly was in the City of Cleveland, Ohio, at the time of his death.

It would, therefore, have been error to direct the jury to return a verdict in favor of the "writings" propounded for probate which purported to dispose of personalty alone,—it being stipulated that no holographic will, either of personalty or realty, was permitted or valid under the law of the State of Ohio.

But, as appears from proponent's motion for a directed verdict, supra, it is his insistence, under his first assignment of error, that the little script of January 5, 1900 (Exhibit "E") constitutes a valid testamentary disposition of Nashville real estate by John P. Farrelly, whether his domicile was in Ohio or Tennessee.

It should not be overlooked that Mrs. Farrelly's will and the order of the County Court admitting it to probate were excluded below, and the "little script" can derive no aid from that source in the consideration of the first assignment of error, for it would not be competent to direct the jury to return a verdict based, either in whole or in part, upon evidence not before the jury.

In order to entitle the "little script" to probate, it must not only appear to be the will of John P. Farrelly, that is, it must be "a paper writing appearing to be intended by the deceased to control the disposition of his property" (Hicks v. Burdette, 10 Tenn. App., 492, 496), but it must also appear that it was found, after the writer's death, among his valuable papers, under circumstances which indicate that he was "preserving it as his will." Tate v. Tate, 11 Humph., 464, 466.

Passing, for consideration in another connection later, the question of whether the "little script" of January 5, 1900, is "a paper writing appearing to be the will", of John P. Farrelly, we think it sufficient for the disposition of the first assignment of error to say that, upon the evidence admitted to the jury, reasonable men might differ as to whether Exhibit "E" was or not found among the valuable papers of the deceased, and "there can be no constitutional exercise of the power to direct a verdict in any case in which there is a dispute as to any material evidence or any legal doubt as to the conclusion to be drawn from the whole evidence, upon the issues to be tried." Tyrus v. Railroad, 114 Tenn., 579, 594, 86 S. W. 1074; Brenizer v. Railway, 156 Tenn., 479, 483, 3 S. W. (2d), 1053.

As before stated, the witness W. A. Scullen testified that, after the death of Bishop Farrelly, he (Scullen) found the documents propounded for probate in a tin "dispatch box," about a foot long, with the name or initials of Bishop Farrelly's mother on the outside of it, in the upper of the only two drawers in a closet, known as the "forbidden closet" in the residence of Bishop Farrelly at Cleveland, Ohio; that Bishop Farrelly always carried the key to said closet; that there was nothing in the "dispatch box" except the papers propounded in this case, which were tied together, in a package or bundle, with a red ribbon; that on the outside of the package were the words, "Last Will and Testament of John P. Farrelly;" that in the drawer with the "dispatch box" were some letters from Bishop Farrelly's mother, some letters described by the witness as "Roman correspondence," some old canceled checks of Bishop Farrelly's, some of his mother's cancelled checks, and one or two rings and a cross which Bishop Farrelly had been accustomed to use on confirmation tours. There was a "picture apparatus" and some stereopticon views in the other of the two drawers in the closet. Dr. Scullen also stated that Bishop Farrelly was accustomed to keep his "good cigars" in the "forbidden closet."

Dr. Scullen testified that he sent all the papers found by him in the "forbidden closet," as above stated (except those offered for probate in this case), to Bishop John B. Morris, at Little Rock, Arkansas. Dr. Fisher, Private Secretary of Bishop Morris, with the papers before him, testified that the papers described by Dr. Scullen

as "Roman correspondence" were not of any value, and that there were no papers in the lot which were of any money or literary value. In fact, there is no evidence, as we read the record, that the "paper writings" offered for probate were found "among" any papers of pecuniary value to Bishop Farrelly, or anyone else. Doubtless the letters to Bishop Farrelly from his mother were of very great sentimental value to him.

There is undisputed evidence in the record that Bishop Farrelly had a "safety deposit box" in the Fourth & First National Bank at Nashville, in which he kept papers of pecuniary value, and in which, when it was opened after his death, was found a bond of the City of Nashville for $1,000, memoranda in regard to other bonds and securities, bank statements, and numerous papers pertaining to financial transactions.

Dr. Scullen stated further in his testimony that Bishop Farrelly kept his "official will" and some other important papers in the vault of "the chancery," and when asked to explain just what he meant by "the chancery" and where it was located, he said:

"It was located then at 1007 Superior Avenue. The chancery is the office of the diocese. The chancellor is in charge of all important papers pertaining to the diocese, financial papers, deeds, abstracts, canceled mortgages, historical data, correspondence of the diocese through all the years; and the Bishop uses it also. It is both an office and a treasury at the same time."

"Valuable papers, within the meaning of the statute, are such papers as are kept and considered worthy of being taken care of by the particular person having regard to his condition, business, and habits of preserving papers. They do not necessarily mean the most valuable papers of the decedent even, and are not confined to papers having a money value, or to deeds for lands, obligations for the payment of money, or certificates of stock. The requirement is only intended as an indication on the part of the writer that it is his intention to preserve and perpetuate the paper as a disposition of his property; and that he regards it as valuable; consequently the sufficiency of the place of deposit to meet the requirement of the statute will depend largely upon the condition and arrangement of the testator." Pritchard on Wills, sec. 237.

In Brogan v. Barnard, 115 Tenn., 260, 263, 90 S. W., 858, the court said that the aforesaid excerpt from Pritchard on Wills "is a clear and correct composite statement of all the decisions of this court construing and defining the provision of the statute under consideration"; but in that case (Brogan v. Barnard) the court went further and held that "the valuable papers contemplated by the Legislature are documentary papers, papers having contents on

account of which they are deemed valuable and worthy of preservation by the owner, as records, belonging to the alleged testator,'' and that it was not sufficient that a will be found among the valuable ''effects'' of the decedent.

On the evidence, which we have briefly summarized, we do not think it can be held, as a matter of law, that the documents, in the handwriting of John P. Farrelly, offered for probate in this case, were found ''among his valuable papers,'' within the contemplation of the statute governing holographic wills. This was an essential fact which it was necessary to prove before the ''writings'' propounded could be probated as the holographic will of John P. Farrelly, and the proponent was not entitled to a directed verdict in favor of the alleged will, if the jury could reasonably draw a contrary inference from the evidence. Tyrus v. Railroad, supra, p. 594; Crutcher v. Crutcher, 11 Humph., 376, 387; Allen v. Jeter, 6 Lea, 672, 677-8; Marr v. Marr, 5 Sneed, 384, 388. The first assignment of error is overruled.

. The second assignment is that the court erred in sustaining the motion of the contestants, made at the close of all the evidence, for a directed verdict.

When the trial court sustained the motion of the contestants for a directed verdict, the inevitable consequence was an adjudication of the issue of devisavit vel non against the proponent and in favor of the contestants. The verdict of the jury, although peremptorily directed by the court, was necessarily based on the evidence admitted to the jury, and that alone. The trial court excluded from the jury, on objection by contestants, the will of Mrs. Farrelly and the order of probate thereof (Exhibit ''N''), and also all other offered testimony referring to the contents of Mrs. Farrelly's will. The rulings of the trial court with respect to these matters are made the basis of proponent's assignments of error numbered 5 to 11, inclusive. If the evidence thus excluded was competent, and was material to the issues, the proponent was, in effect, unlawfully deprived of his right of trial by jury. It is, therefore, necessary that we first determine whether the learned trial judge erred in excluding Mrs. Farrelly's will, which admittedly was not in the handwriting of John P. Farrelly, and was not found, after his death, in the ''forbidden closet'' with the other documents offered for probate in this case, but was found in John P. Farrelly's ''safety deposit box'' in the Fourth & First National Bank at Nashville.

The proponent sought to introduce Mrs. Farrelly's will into the record on the theory that it was ''incorporated by reference'' in the ''little script'' of January 5, 1900. (Exhibit ''E''), which, for convenience, we reproduce here, as follows:

''Lucerne, Switzerland, January 5, 1900.

"I, John P. Farrelly do hereby express my will that my mother's last will and testament regarding the disposal of her property in Nashville real estate, and cash and bonds, be carried out to the letter, or to the very fullest extent feasible.

"John P. Farrelly."

It seems obvious that the "little script" above quoted, standing alone, does not contain any dispositive provisions, that is, it does not, by its own terms, "undertake to dispose of property of the writer after his death, or to control its disposition." Reagan v. Stanley, 11 Lea, 316, 322. The effort of the proponent is to supply the inherent deficiencies of the "little script" by importing into it the provisions of the last will and testament of another than the alleged testator.

The incongruity of attempting to supply the dispositive provisions of a will offered for probate as a holograph, by incorporating therein, and probating as a part of same, a document not in the handwriting of the testator, readily suggests itself when the proposition is stated. Learned counsel for proponent seek to avoid the incongruity above suggested by the counter-suggestion that, the reference to the mother's will did not physically or literally make it a part of the "little script," but that, "by a fiction or legal metaphor," the mother's will should be treated and considered as being incorporated in and a part of the "writing," Exhibit "E," offered for probate. Nevertheless, the proponent is offering for probate the physical document (Mrs. Farrelly's will) and is asking that it be adjudged a part of the will of John P. Farrelly and certified as such to the County Court of Davidson county in order that it may be recorded in the record of wills, along with the "little script" and the other "writings" propounded.

The subject of the incorporation of extraneous writings in wills by reference is not new. It is treated in all the standard text books on wills, and has been a subject of discussion and adjudication in many reported opinions of the courts of the country. But the vast majority of these cases relate to witnessed wills—there being very few reported cases dealing with the subject of "incorporation by reference" in holographic wills—and, for obvious reasons, many of the authorities relating to the incorporation of extraneous documents by reference in witnessed wills cannot be applied to holographic wills. It is necessary, in this connection, to bear in mind the mandatory and unbending requirement of our statute (Shan. Code, sec. 3696) that "the writing and every part of it" must be in the handwriting of the alleged testator.

It is very generally, although not universally, held that a witnessed will may, by proper and sufficient reference, incorporate an extrinsic unwitnessed document. The rule thus generally stated is

elucidated in text books on the subject of wills, which we cite as follows:

Sizer's Pritchard on Wills, sec. 23, pp. 23-24; 1 Page on Wills (2 Ed.), secs. 242-258; 1 Schouler on Wills, Executors and Administrators (6 Ed.), secs. 400-407; 1 Alexander on Wills, secs. 65-68, pp. 75-80; 1 Underhill on Wills, secs. 279-282, pp. 379-382; 1 Jarman on Wills (6 Ed.), pp. 130-135; 2 Woerner on Administration (3 Ed.), sec. 222, p. 747; Theobald on Wills (7 Ed.), pp. 65-69; 1 Redfield on Wills, pp. 263-269; Rood on Wills (1904 Ed.), sec. 249; Lewis on Preparation & Construction of Wills, pp. 10, 11, 17, 23-25, 49-51.

See also, on same subject: 40 Cyc., pp. 1094-1096, sec. 8; 28 R. C. L., pp. 112-113, sec. 64; Case note, 68 L. R. A., pp. 353-384; Case note, 1 A. & E. Anno. Cas., pp. 395-396; 30 A. & E. Ency. of Law (2 Ed.), pp. 578-579; Case note, 107 Am. St. R., pp. 70-74; Case note, 85 Am. D., pp. 762-763; 25 Columbia Law Review (1925), pp. 879-887; 19 Harvard Law Review (1905-06), pp. 528-529.

The text books deal sparingly with the specific subject of "incorporation by reference" in unwitnessed holographic wills. In 1 Underhill on Wills, sec. 10, it is said:

"The doctrine of the incorporation of extrinsic papers by reference is applicable to holographic wills. Thus, a holographic will or a codicil may be operative to revoke wholly or in part an existing non-holographic will to which it is attached, or to which, not being attached, it refers.

"But it has been said that the reference does not incorporate the earlier will as a part of the holographic will to such an extent that the latter is not entirely signed, written and dated by the testator. To what extent non-testamentary papers not written by the testator may be incorporated into the holograph is an interesting question, upon which, up to the present time, there are very few decisions in point.

"Doubtless, if the extrinsic papers were intelligibly referred to, the court would permit them to be consulted as evidence, not to show the intention of the testator, but to explain his meaning as contained in the holograph. But it is extremely doubtful whether such writings would be admitted to probate as parts of the holographic will, they not being dated, signed and written by the hand of the testator."

It is thus made clear that the author of Underhill on Wills did not understand that the general doctrine of "incorporation by reference" as stated in his text (sections 279-282, supra) was in all respects applicable to unwitnessed holographic wills.

In the text of Alexander on Wills, supra (sections 65-68) the rule is stated and elaborated that "a will may incorporate in itself, by

reference, other papers and documents'' (sec. 65), and ''a writing which becomes incorporated in a will by reference, becomes as much a part of the will as though set forth at length in the instrument and is admitted to probate as a part thereof'' (sec. 66), but when the author comes to deal with the subject of unwitnessed holographic wills, he says:

"Since a holographic will must be entirely written by the testator, an extrinsic document cannot be incorporated into such a will by reference unless it is wholly in the handwriting of the testator himself. Any other paper incorporated into a will becomes a part thereof, and if not written by the testator, the whole will cannot be said to be by his hand." (Sec. 465.)

Likewise in Page on Wills, supra, the rule is stated, without qualification, that ''a holograph cannot incorporate another instrument which is not entirely in the handwriting of the testator.'' (Sec. 367.)

We have found no recognition in any text book of a doctrine contrary to that just quoted from Alexander on Wills (sec. 465) and Page on Wills (sec. 367), except in a foot-note (not in the text) on page 131 (Vol. 1), of the 6th Edition of Jarman on Wills, where it is said ''a holograph may refer to a document not in the testator's hand,'' and the case of In Re Soher, 78 Calif., 477, is cited. (We will presently refer more particularly to the case of In Re Soher, supra, as proponent's counsel seem to rely mainly upon it as authority for the ''incorporation by reference'' sought in the case at bar.)

If it be conceded (for the purposes of discussion) that, as asserted in the brief for proponent, ''there can be no distinction, in principle, between a witnessed will and a holographic will, insofar as the doctrine of incorporation by reference is concerned,'' it would not follow that the will of Mrs. Farrelly which proponent is offering for probate was ''incorporated by reference'' in the ''little script,'' Exhibit ''E,'' for it is a well-established rule that the document, or ''writing,'' sought to be incorporated must not only be in existence at the time of the execution of the will, but must also be described therein as existing at that time.

In 1 Jarman on Wills (6 Ed.), p. 132, it is said:

"But whatever be the precise nature of the document referred to, it must be clearly identified as the instrument to which the will points. Two things are necessary: First, that the will should refer to some document as then in existence; secondly, proof that the document propounded for probate was, in fact, written before the will was made, and was identical with that referred to in the will."

In 1 Underhill on Wills, sec. 280, it is said:

"In order that a writing extrinsic to the will may be validly incorporated by the reference of the testator to it in the will, three facts must be shown. In the first place the testator in the will itself must refer to the writing as *being in existence* at the date of execution. *Secondly,* it must be proved (and this of course can only be done by parol evidence) that the writing was *in fact in existence* at the date of the will. *Third,* the writing which is offered for probate as a part of the will *must be identified* by the proponent as the writing which was referred to by a testator." (The words are italicized as in the text.)

In 1 Page on Wills (2 Ed.), sec. 248, it is said:

"The will must, furthermore, refer to the instrument which is to be incorporated, as one which is already in existence. Under most, if not all, circumstances, this is a repetition, in a special form, of the general rule that the reference must be such as to identify the instrument readily. Unless the instrument is referred to as in existence, specific identification is impossible. If, from the terms of the will, the instrument might be executed in the future, any number of instruments might be executed which would correspond to such description. If the will clearly refers to the document as one to be executed in the future, such document cannot be incorporated by reference. . . . Since the document to be incorporated must be referred to in the will as in existence at the date of executing such will, parol evidence is not admissible in the absence of such reference to show that the document was in existence at the time of executing the will."

In the case note to Bryan's Appeal (Conn.), 1 Anno. Cas., p. 396, it is said:

"Where the reference is to papers not yet written, or where the description of the instrument referred to is so vague as to be incapable of being applied to any instrument in particular, parol evidence is not admissible for the purpose of identification; but where there is a reference to a writing described as then existing, in such terms that it is capable of being ascertained, extrinsic evidence is admissible, together with such internal evidence as may be found in the document itself, to supply the necessary proof."

In the "little script," John P. Farrelly describes the writing therein mentioned as "my mother's last will and testament regarding the disposal of her property in Nashville real estate, and cash and bonds." The "little script" was executed on January 5, 1900, and Mrs. Farrelly was then living, and lived for more than two years thereafter, as shown by proponent's proof, and as appears from the order of probate of Mrs. Farrelly's will, which proponent is offering in

evidence along with the will. A reference to the "last will and testament" of a living person is not, without more, a reference to an existing document.

Mrs. Farrelly could have executed a will at any time between January 5, 1900, and her death on April 13, 1902, which would have filled the description in the "little script" as fully and accurately as the will (Exhibit "N") offered here. It is said in 1 Schouler on Wills, etc. (6 Ed.), sec. 405, that

"An instrument directing that property shall go in the same way as in another person's will already executed may constitute a will together with the will of the other person, but a direction giving property as provided in the last will of another living person is void as an incorporation by reference as there is no reference to any particular will and the other person may make a new will."

Counsel for proponent cites four cases as supporting the proposition advanced by them that "a testator may make a valid disposition of his property by reference to the will of another which is then in existence and identified," viz.: Kerr v. Girdwood, 138 N. C., 473, 107 Am. St. R., 551, 50 S. E., 852; Gerrish v. Gerrish, 8 Ore., 351, 34 Am. R., 585; Bemis v. Fletcher (Mass.), 37 A. L. R., 471, 146 N. E., 277; Nightingale v. Phillips, 29 R. I., 175, 72 Atl., 220.

Kerr v. Girdwood, supra, was a suit for the contruction of a certain clause in the holographic will of Mrs. Laura A. Girdwood, as follows:

"I wish to record the wishes of my darling husband as expressed to me in his last illness. He felt that he had left me well provided for, and was so thankful to think so, and wanted me to have exclusive use of all property, and everything so long as I live. At my death he wished the two laundry properties to be sold, or disposed of to the best advantage, and the proceeds of the sale to be equally divided between his sister (if living) and his brothers, who are living. He wished me to do just as I pleased with my home place, and personal property, and I hereby express my wishes."

The testatrix then proceeded to dispose of her "home place" and to give sundry legacies, but left undisposed of a lot in the City of Asheville on Bailey Street, which descended to her sister, Bethel Clayton, as her heir, and a lot on Pendlen Street, and also left undisposed of personal property and money. The testatrix, besides other dispositions, made provision for her mother, Mrs. Salena Roberts, and her sister, Mrs. Bethel Clayton.

The court said:

"The only question presented on this appeal relates to the legal effect of the language above quoted employed by the testatrix in what is undeniably a testamentary document.

"Are these words testamentary in character, or merely a recital of an occurrence which had taken place between her and her husband? After carefully considering the entire will in the light of the authorities we have concluded that it was the intention of the testatrix in employing these words that they should have a testamentary effect, and that the language employed by her is of such legal efficacy that the law can give force to it and execute her intention. . . .

"The words she used point out unmistakably the particular property she intended to devise, and also indicate unerringly the persons to whom such property shall go. In reciting her husband's wishes, she evidently intended then to carry them out and to indicate that they were in accord with her own. She made no subsequent disposition of these properties to other persons, and did not again refer to them in her will. It is almost inconceivable that she intended to die intestate as to them."

No allusion was made in the opinion to the doctrine of "incorporation by reference."

The Oregon case of Gerrish v. Gerrish, supra, was "a suit in equity to quiet title to a certain parcel of land lately owned by Mary Ann Gerrish, deceased," and the question arose as to whether a portion of the will of Mrs. Gerrish's husband was "adopted as a portion of her will" (evidently a witnessed will). The clause of Mrs. Gerrish's will involved was as follows:

"I direct that whatever may remain at my death of the personal property bequeathed to me by my late husband James Gerrish, for my life, shall at my death be distributed in accordance with the provisions made in the last will of my said husband concerning the same."

It is seen that, in her will, Mrs. Gerrish described the document to which she referred as "the last will" of my late husband "James Gerrish," by which he "bequeathed to me" certain property. It thus appeared on the face of Mrs. Gerrish's will that the reference was to the last will of a person who was then dead, which was necessarily a reference to a particular will existing at the time of the execution of her will. This was a sufficient description to admit of further identification by extrinsic evidence.

The Massachusetts case of Bemis v. Fletcher, supra, was a proceeding for the construction of the witnessed will of Mrs. Ida F. Estabrook. At the time Mrs. Estabrook executed the will under construction, her husband was living and had theretofore executed a will,

which will of the husband became effective at his death, before the death of his wife. By certain clauses of her will, Mrs. Estabrook gave the residue of her estate to her husband, and then, the will provided that, 'if he be not living at my decease,'' the residue is given ''to those persons who shall be appointed trustees under my said husband's will, to whom by his will my husband shall give the residue of his estate in trust,'' and to their successors, to be administered with the same rights and powers, and to be disposed of to the same persons or corporations in the same manner as ''shall be provided for the trust established'' by her husband's will relating to the residue of his estate.

The question was, whether the will of her husband was incorporated in Mrs. Estabrook's will by the references above quoted. It appears from the briefs published with the opinion in the A. L. R. that it was contended that the description (of Mr. Estabrook's will in Mrs. Estabrook's will) was such that a will of Mr. Estabrook written after Mrs. Estabrook's will was executed would answer it as well as one written before, and that the description was therefore not sufficient, even though it could be shown (by extrinsic evidence) that there was a paper of the character described actually in existence when Mrs. Estabrook's will was executed. In the opinion, the Massachusetts court did not deal specifically with the contention thus made, but contented itself with stating its conclusion that,

''Mrs. Estabrook intended that the residue of her estate should go to the charities mentioned in the eighth clause of her husband's will. When her will of 1910 was made, her husband's will with the codicils had been executed. . . . Her reference in the third clause of the will 'to those persons who shall be appointed trustees' is nothing more than a recognition of the fact that the trustees named in the fourth clause were to be appointed in the future. Her reference to the trust to be disposed of 'as shall be provided,' and the other language looking to the future, are not sufficient to show that she had in mind some future will to be made by him. She had in mind this will, then in existence, to be effective on the death of the testator. In our opinion, Mrs. Estabrook intended to incorporate into her will the eighth clause of her husband's will, as a part of her will, and a valid trust was therefore established, to be administered as indicated in his will. . . . She had in mind and referred to an existing will of her husband, a will of which she had knowledge. She did not refer to any will her husband might execute in the future, her reference was to 'my said husband's will' and to 'the trust established by my said husband's will relating to the residue of his estate.' This will of her husband's

was admitted to probate in September, 1919. Mrs. Estabrook did not die until 1922; she made no changes in her will after his death. We need not, therefore, consider what construction should be given to her will, if her husband had made another will after 1910. This event did not happen, and the intention and purpose of Mrs. Estabrook should be made effectual to carry out the end she had in view.''

With the greatest respect for the distinguished and learned tribunal deciding the case of Bemis v. Fletcher, we are of the opinion that it is contrary to the great weight of modern authority on the point decided; and in this view we do not seem to be altogether alone. The opinion in Bemis v. Fletcher was handed down on February 2, 1925, and in the November, 1925 number of the Columbia Law Review there was published an article on the subject of ''Incorporation by Reference,'' and in a footnote thereto (on page 883) it is said:

''In a few cases where the writing or schedule is referred to in terms of the future, although, in fact, in existence at the time the codicil was executed, the schedules have been held to be incorporated without reference to them as in Goods of Hunt (1853), 2 Rob. Ecc., 622; Goods of Stewart, infra, footnote 21; but the court refused to follow this view in Goods of Matthias (1863), 3 Swab & Tr., 100, and the rule was finally settled the other way. The recent case of Bemis v. Fletcher (Mass., 1925), 146 N. E., 277, seems to return to this discarded view.''

Although the Rhode Island case of Nightingale v. Phillips, supra, was cited in the proponent's brief as stated, we find no comment on that cases in any of the briefs. We think it is sufficient for present purposes to say that, in that case (which was a bill for the construction of the will of Susan E. Nightingale), it appeared that all of the heirs at law of Susan E. Nightingale, and all of the legatees named in her will, had joined in a petition to the Probate Court to have a certain witnessed paper writing probated as the will of Susan E. Nightingale, deceased, and that an extraneous document referred to therein, viz.: will of Harriette F. Nightingale, a deceased sister of the testatrix, be probated as a part of same, and it was stated in the petition for probate that ''all the heirs at law and the legatees under the will hereby express their willingness to waive all their legal rights if said proposed will may be probated.'' Although the court in the opinion discussed the doctrine of incorporation by reference, we do not see how any of the parties were in a position to deny the right to treat the will of Harriette Nightingale as incorporated in the will of Susan E. Nightingale. However, we will say, without discussion, that the court might with reason have construed

the proposed will of Susan E. Nightingale as referring to the will of Harriette F. Nightingale as a document then in existence, that is, at the time of the execution of Susan E. Nightingale's will.

If it should be held that an unwitnessed holograph may by reference incorporate an extrinsic document not in the handwriting of the testator, nevertheless the attempt to have Mrs. Farrelly's will of July 12, 1896, probated on the theory that it was incorporated by reference in the "little script" of January 5, 1900, would necessarily fail, for the reason that the "last will and testament" of Mrs. Farrely is not described in the "little script" as in existence at the date of the execution thereof by John P. Farrelly and, in the absence of such description, parol evidence is not admissible to identify any particular will of Mrs. Farrelly as the one to which reference was made. See authorities supra, and for many reported cases on the subject see, Case Notes, 68 L. R. A., pp. 354-366; 1 A. & E. Anno. Cas., pp. 395-396, and 37 A. L. R., pp. 1476-1477.

The proposition last stated is upon the assumption that counsel for proponent are right in their assertion that "there can be no distinction, in principle, between a witnessed will and a holographic will, insofar as the doctrine of incorporation by reference is concerned." But we cannot agree to the contention of the learned and able counsel for proponent on this point.

In our opinion, there is a distinction between a witnessed will and an unwitnessed holographic will, with respect to the application of the doctrine of incorporation by reference, which distinction grows out of the statutory requirement that an unwitnessed "paper writing" is not entitled to probate as a will unless "every part of it" is in the handwriting of the alleged testator. This requirement of our statute has been carefully guarded and sedulously maintained by the courts of this State from its beginning, and to permit dispositive provisions of an unwitnessed holographic will to be supplied by the adoption of an extrinsic document not in the handwriting of the testator would nullify the statute. It was so held by the Supreme Court of Mississippi in the case of Hewes v. Hewes, 110 Miss., 826, 834, wherein the question was squarely presented and the court stated the rule there adopted and applied as follows:

"When an extrinsic document is incorporated into a will by a reference thereto in the will, it becomes a part and parcel thereof; and since a will not attested by witnesses must be 'wholly written' by the testator himself, it necessarily follows that for an extrinsic document to be incorporated into and thereby become a part and parcel of a will valid only if 'wholly written' by the testator himself, such documents must also be so written;

for should it not be, the whole will would not be in the handwriting of the testator.''

The case of Hewes v. Hewes, supra, is cited, without a suggestion of criticism, as authority for the statement in the text of Page on Wills (2 Ed.), sec. 367, and in Alexander on Wills, sec. 465, that a holograph cannot, by reference, incorporate an extrinsic document not entirely in the handwriting of the testator.

Alexander cites also Gibson v. Gibson, 28 Gratt. (69 Va.), 44, which was cited by the Mississippi court in Hewes v. Hewes. In Gibson v. Gibson, two unwitnessed paper writings, designated in the opinion as No. 1 and No. 2, were offered for probate. No. 1 was as follows:

"I, Elizabeth S. Holmes, do make the following as my last will and testament. I give all my estate, both real and personal, to my two sisters, Margaret and Sally. Written and signed by me this 16th day of April, 1851.''

No. 2 was written about an inch below No. 1, and on the same sheet of paper, and was as follows:

"As Mary is dead, I give her share to my niece, Lizzie Leigh Gibson.

"(Signed) E. S. Holmes,
"December 31st, 1871.''

No. 1 was not in the handwriting of the decedent and not signed by her. Both the body and the signature of No. 2 were wholly in the handwriting of the decedent. The Virginia statute required that an unwitnessed will "be wholly written by the testator.'' The court held that No. 2 was too vague and indefinite to be established as a will by itself, and that it could not be taken in connection with No. 1, as that was not in the handwriting of the decedent; therefore, neither No. 1 nor No. 2, nor both together, was a valid will, and the judgment of the court below denying probate was affirmed.

In the case of Sharp v. Wallace, 83 Ky., 584 (cited for contestants), the court did not, in terms, discuss the doctrine of "incorporation by reference,'' but the principle on which the court rested its decision in that case is in point here. The facts of that case and the question for decision are stated in the opinion of the court as follows:

"The paper in contest in this case purports to be the will of Evelina J. Sharp, is dated January —, 1867, and subscribed by her; but though formally stated in the attestation clause above her signature to have been done, it never was, in fact, either subscribed or acknowledged by her in the presence of attesting witnesses, nor was it wholly written by her. It, therefore, manifestly has no independent efficacy as her will.

"But it appears that subsequently she wrote on the same sheet of paper, and subscribed what was evidently intended by her as a codicil to the instrument mentioned, and to which she refers in the following words: 'Codicil, August 31, 1870. After examining this will, I wish to add in my own handwriting the following codicil.' She then proceeds in the codicil to direct that a certain farm in the State of Missouri be rented and improved ten years before it is sold, and divided among her heirs, to make a conditional gift to a church, and to provide that any child or grandchild who may oppose any settlement made by her as executrix of her deceased husband, or institute suit against her or her sureties under the pretext of getting his rights, shall receive five dollars only of her estate.

"The question presented to us for consideration is, whether the instrument purporting to be a codicil which was wholly written and subscribed by her, and, therefore, itself executed in one of the modes prescribed by the General Statutes, has the effect to set up and give validity to the paper dated January, 1867."

The pertinent Kentucky statute required that unwitnessed wills be "wholly written by the testator." The court said that the reference made in the codicil to the preceding instrument was definite enough to identify it; that clearly the decedent intended the two as her will and believed they would be valid as such; that if the codicil had been witnessed in the manner required by the statute for witnessed wills, it would have had the effect to give validity to the preceding unfinished instrument as her will; for, said the court (quoting from Beal v. Cunningham, 3 B. Monroe, 390, 39 Am. D., 469), "a codicil executed with the solemnities required by the statutes for passing lands is a republication of a will, and both taken together make but one will," and "if the codicil can so ingraft itself upon and draw within its operative influence a revoked will as to amount to a republication, we cannot perceive why it may not ingraft itself upon and draw within its operative influence any instrument which the testator may treat as his will, so as to amount to a republication of the whole as his will."

But, applying the statute governing holographic wills to the facts of the case, the Kentucky court stated its conclusions as follows:

"The object of the statute providing the manner in which a will shall be executed to render it valid is to insure identity and prevent imposition and fraud. And though a substantial compliance with it is all that is required, no court is authorized to admit to probate an instrument as the last will of a deceased

person in violation of its express language, however well founded may be the belief it was intended by him as his will.

"Taking the codicil and preceding unfinished instrument together as but one will, as it seems to us we are bound to do, it was not executed in either of the modes required by the statute, not having been wholly written by the testatrix, nor subscribed or acknowledged by her in the presence of attesting witnesses.

"It is true a document may, for the purpose of identification of an object or person mentioned in a will, or to elucidate and explain the intention of a testator, be referred to and made part thereof; but we are unable to perceive how any instrument, testamentary in its character, but not fully and properly executed as a will, can be made efficacious as such under our statute by mere reference in a codicil not itself subscribed or acknowledged before attesting witnesses.

"We are, therefore, constrained to decide that the two instruments before us were not executed in compliance with the statute, and cannot, without violating it, be admitted to probate as the will of Evelina J. Sharp."

Learned counsel for proponent concede that the Mississippi case of Hewes v. Hewes, supra, is in point and holds adversely to their contention, but they question the applicability of the cases of Gibson v. Gibson and Sharp v. Wallace, supra, to the instant case. They rely mainly upon the case of In Re Soher, 78 Calif., 477, as announcing the principle which, they say, should control here, and that is, that the doctrine of incorporation by reference is "merely a convenient legal fiction," which makes the extraneous document a part of the will by "a metaphorical incorporation."

In the Soher case, supra, it appeared that Lewis Soher executed before two witnesses, in the form prescribed by statute, a will which was in the handwriting of another. Subsequently he attached to said will the following codicil:

"Owing to the conduct of my son Adolph toward my wife and myself since this will was made, I hereby affirm the foregoing will, except in the ninth article of bequests, where Adolph is included with my wife and other children, which bequest to Adolph I hereby revoke.

"Witness my hand this twenty-ninth day of April, 1886.

"Lewis Soher."

The court said:

"It is contended that an attested will cannot be revoked by an olographic codicil. The position of the respondent is based upon the fact that the olographic document refers to the other.

The argument is, that the olographic codicil cannot be understood without referring to the attested will; that the latter is in contemplation of law 'a part' of the former, and that therefore it does not come within the definition of an olographic will, which is a will 'entirely written, dated and signed by the hand of the testator himself.' This argument, if allowed to prevail, would have far-reaching consequences. It would exclude all reference to any document which was not entirely written, dated and signed by the testator himself. For example, an olographic will which devised all the right, title, and interest of the testator under a will of his ancestor, or under a marriage settlement or other contract drawn by another hand, would be invalid. Pushed to its logical conclusion, the argument would exclude all reference to deeds or other documents for descriptions of property, etc.

"A similar objection was at one time made to references in attested wills to documents which were not attested. Wills have always been required to be executed with formalities of some kind or other; and it was argued that documents which were not executed with these formalities could not be referred to. But considerations of practical convenience prevailed over technical reasoning. And it became well settled that an attested will could refer to documents which were not attested. See Newton v. Seaman's Friend Society, 130 Mass., 91, 39 Am. Rep., 433; Baker's Appeal, 107 Pa. St., 381; Brown v. Clark, 77 N. Y., 377; Fickle v. Snep, 97 Ind., 291, 49 Am. Rep., 449; Fessler v. Simpson, 58 Ind., 87; Gerrish v. Gerrish, 8 Or., 351, 34 Am. Rep., 585; and see Estate of Shillaber, 74 Calif., 144. Now, if an attested will can refer to a document which is not attested, we see no good reason why an olographic will may not refer to a document which is not in the handwriting of the testator. The only difference between an olographic and an attested will' is the form of the execution. The statute has prescribed two forms in which written wills may be executed. In each case the instrument must be signed by the testator. But the formality of witnesses is dispensed with if the instrument is all in the handwriting of the testator himself. One form is the precise equivalent of the other. Whatever would be good as an attested will or codicil is good as an olographic one, if written, dated, and signed by the hand of the testator. And whatever may be done in or by the one may be done in or by the other. Therefore, if the formalities of attestation are not required in a document referred to by an attested will or codicil, the corresponding for-

malities are not required in a document referred to by an olographic will or codicil.

"The argument made for the respondent rests upon the proposition that a document referred to by a will or contract is in contemplation of law 'a part' of the document making the reference. And if this be granted in the sense in which it is asserted, a very plausible argument can be built upon it. But as has been said in other connections, it is not true as a matter of physical fact that the two documents are one and the same. The law for some purposes—mainly of construction—regards one as a part of the other. But this fiction ought not to be extended to absurd or unjust consequences. See City of Napa v. Easterby, 76 Calif., 222; Bull v. Coe, 77 Calif., 54. And we think it should not be extended so as to cover the present case. The will which the statute requires to be attested by witnesses in the one case, and written by the testator in the other, is the document signed by him. The documents referred to are for the purpose of explaining the meaning of the will and aiding in its construction."

It should not be overlooked that the opinion in the Soher case, which we have quoted, was intended as an answer to the contention that "an attested will cannot be revoked by an olographic codicil." This was the question with which the court was dealing, and the language used in the opinion should be confined, in its application, to that question and interpreted accordingly. We think that, in the Soher case, the court intended to be understood substantially as follows: (1) it is not true as a matter of physical fact that the incorporating document and the incorporated document are one and the same; (2) the law, for some purposes,—mainly of construction—regards the incorporated document as a part of the incorporating document; (3) this is a "fiction," in the sense that it is contrary to the physical fact, but it would be extending this legal fiction to "an absurd" extent to hold that an attested will cannot be revoked, in whole or in part, by a subsequent holographic will or codicil, upon the theory that this would be an invasion of the statute of California defining a holographic will as a will which is "entirely written, dated, and signed by the testator himself." We think this is a fair statement, in brief form, of the thought which the court, in the Soher case, intended to convey; but we are of the opinion that this falls far short of a holding that the dispositive provisions of an unwitnessed holographic will may be supplied by a reference therein to an extrinsic document not in the handwriting of the testator, which, we hold, cannot be lawfully done, in view of "the plain wording of the statute" (Shan. Code, sec. 3696). Therefore, the trial court did not

err in excluding the will of Mrs. Farrelly, and the order of probate thereof, from the jury, and in declining to admit Mrs. Farrelly's will to probate in this case; and the proponent's fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twenty-first, twenty-second, twenty-sixth, twenty-seventh and thirty-second assignments of error are overruled.

In this connection, we may as well dispose of the twenty-third, twenty-fourth, twenty-fifth, twenty-eighth, twenty-ninth, thirtieth and thirty-third assignments of error, through which the proponent challenges the action of the trial court in permitting the contestants to withdraw, and decline to read to the jury, certain parts of depositions of witnesses examined on behalf of the contestants, which parts of the depositions constituted testimony relating, in one form or another, to Mrs. Farrelly's will (Exhibit "N"). The rulings thus complained of were made after the court had held that Mrs. Farrelly's will, and the order of probate thereof, were not competent evidence in the case, and had excluded them from the jury. At the time the depositions were taken and filed, in advance of the trial, counsel, of course, did not and could not know whether the trial court would or not admit Mrs. Farrelly's will, and contestant's counsel therefore examined some of their witnesses with respect to matters touching said will, but before any part of said depositions were offered at the trial, the court had ruled that Mrs. Farrelly's will was inadmissible, and the contestants therefore declined to read, and asked leave of the court to withdraw, all testimony elicited by them relating to Mrs. Farrelly's will, which the court, over the objection of the proponent, permitted the contestants to do—the particular testimony thus withdrawn being pointed out specifically in each instance.

We are not aware of any rule of practice which would compel a party to introduce incompetent testimony, under the circumstances stated, even though it was included in a deposition with competent testimony offered and admitted. The aforesaid assignments of error complaining of the ruling of the trial court with respect to this matter are overruled.

The proponent's fourth assignment is that "the court erred in refusing to admit to probate the separate testamentary disposition of John P. Farrelly, dated January 5, 1900, and relating to his mother's Nashville property, real estate, cash and bonds, which was entitled to probate irrespective of testator's domicile, as a will disposing of Nashville real estate."

The question thus presented is one of the questions arising under the assignments of error through which the proponent complains of the action of the court (1) in refusing to direct a verdict for the proponent and (2) in directing a verdict for the contestants.

Is the "little script" (in the absence of Mrs. Farrelly's will) a "paper writing appearing to be the will" of John P. Farrelly? "The first and paramount question is, whether it be the will at all under the statute." McCutchen v. Oehmig, 1 Baxt., 390, 397.

Although all the requirements of the statute (Shan. Code, sec. 3896) be complied with, the paper writing is not entitled to probate if it is "without testamentary form" (Marr v. Marr, 2 Head 303, 309), and does not "appear to be a will." Tate v. Tate, 11 Humph., 464, 466.

"It should manifestly appear that it is intended as a disposition of the testator's lands, to take effect at his death; and, it is evident that this intention will best appear if the paper have the usual formality of a will." Crutcher v. Crutcher, 11 Humph., 376, 386.

The inquiry in the case of Crutcher v. Crutcher, supra, was whether a script propounded as the holographic will of Thomas Crutcher, deceased, was or not his will. In the opinion the court said:

"The great requisite of a will is the animus testandi, not in any general sense, but in reference to the script propounded as a will. In the case in 2 Phill., 180, referred to, Sir John Nichol observes, that 'a witness attests a will for the purpose of giving authenticity to the factum of the instrument; the animus testandi is the very point into which the court of probate is to inquire— the mere act of witnessing or signing does not exclude, of necessity, the absence of the animus testandi, any more than the mere act of cancellation excludes of necessity the absence of the animus revocandi. It may have been signed under duress, or under other circumstances where there was no intention to make a testamentary disposition.' With much greater force will these observations apply, when the paper is imperfect, or not executed, or is informal and inartificial in its character, as to render it difficult to say, whether it was intended as a deed or a will, or as mere notes and memoranda for a will."

"It is sometimes difficult in will contests to draw the line between questions of fact and questions of law." 28 R. C. L., p. 405, sec. 417. But whether a writing propounded and contested is or not prima facie testamentary in its nature and character is a matter for the court to determine. Magee v. McNiel, 41 Miss., 17, 90 Am. D., 354, 358; Note, 69 Am. D., p. 455.

Exhibit "A" (the writing purporting to dispose of specific articles of personalty) and Exhibit "E" (the little script) bear the same date—January 5, 1900—but neither can be said to be a codicil to the other, for it is impossible to determine which was written first.

"A will, to operate as such, must, as a rule, make or attempt a

total or partial disposition of property, to take effect at the testator's death, or at least, must name an executor; and, it is not enough that the instrument purports to be a will and is executed with all the testamentary formalities, when it accomplishes nothing of a testamentary character." 1 Schouler on Wills, etc. (5 Ed.), sec. 294.

The "little script" does not name any legatee or devisee to take any property of the writer, and does not purport to dispose of any of his property. It therefore lacks the essentials of a testamentary paper, and was not entitled to probate as the will, or any part of the will, of Bishop Farrelly.

Exhibit "A" is testamentary in form and purports to be a will of John P. Farrelly disposing of specified articles of personal property. Exhibits "C" and "D" purport to be codicils to his will and also purport to bequeath certain personalty.

If John P. Farrelly was domiciled in the State of Ohio at the time of his death, none of the writings propounded, purporting to dispose of personal property, were entitled to probate.

It is contended, for the contestants, that the undisputed and determinative facts in evidence show that Bishop Farrelly was, at the time of his death, domiciled in the State of Ohio. On the other hand, it is said, for the proponent, that the evidence as to domicile is not undisputed, and that there is "strong and cogent evidence tending to show that his domicile was in Nashville."

Bishop Farrelly's domicile of origin, or domicile of nativity, was Memphis, Tennessee, but, as before stated, his mother took him to Arkansas when he was a small child, and he never thereafter lived in Memphis. After his ordination as a priest, he lived for five years in Nashville, Tennessee, and, to all appearances, established his domicile there. He then went to Rome, where he resided for twenty-two years, and we think it quite clear, and undisputed, on the record, that he established his legal domicile in Rome, although not naturalized as an Italian citizen. He buried his mother and a favorite cousin (Miss Ruth Brooks) in Rome, and reserved a tomb for himself beside them, where, according to his explicit and unequivocal statements in letters written by him (and which original letters are in the record), he expected to be buried. This negatives the existence of any intention on his part, while he lived in Rome, to ever again take up his residence in Nashville. Having thus lost his legal domicile in Nashville, it was never re-acquired. His residence after he left Rome was, for many years, in Cleveland, Ohio, and there is no evidence that he at any time during his residence in Cleveland expected to live elsewhere. It is said, for proponent, that Bishop Farrelly frequently referred to Nashville as "home;" that he visited Nashville at least once each year, had many friends there, and when planning these visits

would speak of "going home;" that he did not vote in Cleveland, and that he kept a bank account in Nashville.

There is no evidence that Bishop Farrelly voted anywhere, and the fact that he had a bank account in Nashville (where the property of his mother's estate was located) would not be of any weight in the light of the other controlling facts disclosed by the record.

A person may have two or more residences but only one legal domicile. He must have a domicile somewhere, but he can have only one; therefore, in order to lose one he must acquire another. Domicile and residence are not synonymous terms in the law. Domicile imports a legal relation existing between a person and a particular place, based on actual residence, plus a concurrent intention there to remain as at a fixed abiding place. The law will, from facts and circumstances, fix a legal residence for him, unless he voluntarily fixes it himself, and when a legal residence is once fixed, it requires both fact and intention to change it. Boone v. Boone, 3 Tenn. App., 141, 145; Williams v. Saunders, 5 Cold., 60, 80; Brown v. Brown, 150 Tenn., 89, 261 S. W., 959; 9 R. C. L., pp. 538-539, and pp. 553, 555.

"But intent alone without actual residence cannot determine the domicile; and, conversely, a domicile once established cannot be given up by merely intending to do so, and without actual removal. Therefore one who has resided and carried on business for years in one jurisdiction cannot for his own purpose insist that his domicile is in another. The facts may belie the expressed intent to retain a domicile actually given up." 9 R. C. L., p. 543, and Notes, 4, 5 and 6.

To effect a change of domicile, naturalization in the country one adopts as his domicile is not essential. 9 R. C. L., p. 553.

To effect a change of domicile, "the fact and intention must concur." Layne v. Pardee, 2 Swan, 231, 235.

"If there be both actual residence and an intention of remaining —the animus manendi—then a domicile is established;" but domicile cannot be established or retained by "a mere mental act." Denny v. Sumner County, 134 Tenn., 468, 479, 481, 184 S. W., 14.

"A mere floating purpose to return to this State at some time will not be sufficient to destroy the presumption that his change of residence imported also a change of domicile." Keelin v. Graves, 129 Tenn., 103, 113, 165 S. W., 232, L. R. A., 1915-A, 421.

"The intention, however, to return to the domicile of nativity, or one acquired, must be fixed, absolute and unconditional." Sparks v. Sparks, 114 Tenn., 666, 669, 88 S. W., 173. See also, on the subject of domicile: Hascall v. Hafford, 107 Tenn., 355, 65 S. W., 423, 89 Am. St. R., 952; White v. White, 3 Head 404; Allen v. Thom-

ason, 11 Hump., 535, 54 Am. D., 55; Foster v. Hall, 4 Humph., 348; Kellar v. Baird, 5 Heisk., 39.

Applying the principles announced by the authorities cited to the undisputed facts of this case, we are of the opinion that the legal domicile of Bishop Farrelly, at the time of his death, was in the State of Ohio. It follows, therefore, that the writings propounded were not valid testamentary dispositions of personal property of John P. Farrelly, and not entitled to probate as such.

It results, from the views we have stated, that the second assignment of error (that the court erred in sustaining the motion of the contestants for a directed verdict) and the third assignment of error (that the court erred in refusing to admit to probate any of the documents offered by proponent as constituting the last will of John P. Farrelly) must be, and they are, overruled.

Having sustained the action of the trial court in directing a verdict in favor of the contestants, it is obvious that any disposition we may make of the assignments of error not heretofore mentioned will not affect the result in this court. Therefore, we will not extend this opinion (already too long) by a discussion of the remaining assignments of error, but will content ourselves with a brief statement of our rulings thereon.

As hereinbefore stated, the trial court ruled that the will executed by Bishop Farrelly on September 11, 1909, known in the record as the "official will," would be "admitted for evidentiary purposes," but denied and overruled the motion of contestants to have said will admitted to probate.

Through his twelfth and fifteenth assignments of error the proponent complains of the action of the court in admitting said will in evidence, insisting that it "was irrelevant, immaterial and wholly incompetent for any purpose in the trial of this case."

The twentieth assignment questions the admission of the probate and other proceedings connected with the "official will," insofar as same were offered on the question of domicile. The twelfth, fifteenth and twentieth assignments are overruled. We think the "official will" and the probate proceedings thereof were admissible as evidence (bearing on the question of the domicile of Bishop Farrelly). Shan. Code, secs. 3918-3920; Smith v. Neilson, 13 Lea, 461, 466; 40 Cyc., 1380-1381.

Through his thirteenth, fourteenth and sixteenth assignments the proponent asserts that the court erred in holding that the said "official will" of September 11, 1909, was competent evidence to show revocation of a prior will of John P. Farrelly, after said "official will" had been denied probate in this case.

If the record showed that the trial court so ruled, we would hold such ruling erroneous, for two reasons.

(a) "A will takes its legal validity from its probate." 2 Woerner on Administration, p. 701. A paper purporting to be a will is without legal force and effect as a will until it is probated. State v. Lancaster, 119 Tenn., 638, 651, 105 S. W., 858; Zucarello v. Erwin, 2 Tenn. App., 491, 498, and cases cited. "An instrument purporting to be a will, containing a revocatory clause, cannot be offered in evidence as a revocation merely, without probate thereof." 1 Woerner on Administration, sec. 50, p. 137.

(b) The wording of the "official will," when read in the light of the conditions and circumstances surrounding the testator at the time of its execution, shows plainly that he was dealing exclusively with church property—was making the will in an official capacity and in the form and manner required, by the law of his church— and negatives an intention that the will should affect his individual property, or any disposition he made, or attempted to make, of same. It is elementary, in the law of wills, that the intention of the testator—to be ascertained from the will, interpreted in the light of the surrounding facts and circumstances—will control.

But it does not appear from the record that the trial court held, or was of the opinion, that the "official will" could be considered as evidence of revocation of a prior personal or individual will of John P. Farrelly. The record is lacking in even a suggestion of the particular ground or theory of the law or the facts upon which the learned trial judge rested his ruling when he directed a verdict in favor of the contestants.

The seventeenth assignment is as follows:

"The court erred in overruling the motion of the executor, made after the introduction of all the evidence in the case to strike out all testimony in the record as to the disposition by the said John P. Farrelly, in his lifetime, of any articles mentioned in his will, or concerning the disposition by Dr. Scullen of any of said articles after the death of the said John P. Farrelly, or any declarations alleged to have been made by Bishop Farrelly, in his lifetime, with regard to the disposition of his property, in so far as said evidence was offered to show a revocation of his personal will."

The motion to which this assignment refers, and the ruling of the court thereon, appear in the bill of exceptions as follows:

"Mr. Malone: Now, may it please Your Honor, we move to strike out and exclude all of the testimony in this record about Bishop Farrelly having disposed of any articles mentioned in the will, during his lifetime, or Dr. Scullen having disposed of any these articles after his death, or any declarations alleged to have been made by Bishop Farrelly in his lifetime with regard to the disposition of his property. We move to strike all that out in so far as it is offered to show a revocation in this

case, on the ground that it is not competent evidence to show revocation.

"I think, perhaps Your Honor has ruled on that question, but there may be some additional evidence that has come in since the last time that was up, so I just wanted to get clear on that.

"The Court: The motion will be overruled. I have already acted on it and stated Bishop Farrelly's declarations would not be sufficient to revoke a will, but they might be competent, in connection with acts of the testator, in showing his intention, and I think I so stated heretofore in the presence of the jury. You can note your exception.

"Mr. Malone: Yes, we will note an exception Your Honor."

Ordinarily it is not competent, on the trial of an issue of devisavit vel non, to show, as evidence of revocation, that, after the contested writing was executed, the testator, in his lifetime, sold or gave away the property embraced therein. Young v. Crowder, 2 Sneed, 155. Likewise, oral declarations of the alleged testator are ordinarily incompetent as evidence of a revocation of a written will. Marr v. Marr, 2 Head, 303, 310. But in Marr v. Marr, supra, the court said: "We will not say that verbal declarations are not admissible as evidence in these cases for some purposes. In a case like this, they may be looked to as circumstances to aid in the determination of the question so much controverted; whether the paper was deposited and found among his valuable papers or effects, but not of themselves, to work a revocation. They may tend to illustrate the original intent, but not to show a change of that purpose which is established by the fact of a legal and continuing deposit of the paper. In the case of Crutcher v. Crutcher, they were proper, because the doubtful question there, was, whether the papers then found were even intended to be testamentary, as they were imperfect, unfinished, and not in the form of testaments, though written by himself."

Although not competent to show revocation, the testimony, or parts of it, to which the motion here in question was directed, was competent for other purposes, and the seventeenth assignment of error does not point out specifically the testimony which the proponent sought to have stricken, as required by Rule 11, subsec. 3, of the printed rules of this court. The seventeenth assignment of error is overruled.

The nineteenth assignment asserts that the trial judge erred in failing to exclude, upon objection by proponent, certain specified questions and answers of the witness Dr. Scullen, which testimony is set out in the assignment. This testimony related to conversations between Dr. Schullen and Bishop Farrelly, in which, according to the witness, Bishop Farrelly gave Dr. Scullen directions regarding

the disposition to be made of certain items of personal property (watch, chain, etc.) different from the dispositions made of the same items in the will, Exhibit "A" to Scullen's deposition. The trial court ruled that the evidence was not competent to show revocation, but that it might be competent for other purposes and he would admit it with proper instructions to the jury "as to how they are to regard these oral statements of the deceased." .We think the ruling of the court was proper, and the nineteenth assignment of error is overruled.

We are of the opinion that the letter of Dr. Scullen to Bishop Morris (Exhibit "A" to the deposition of Dr. Fisher), to which the eighteenth assignment of error relates, was competent (if for no other purpose) as bearing upon the credibility of Dr. Scullen, and the trial court did not err in admitting it in evidence (which doubtless the court did with the purpose in view, as stated by him with respect to other similar testimony, that he would instruct the jury as to how they should consider all testimony on that line). The eighteenth assignment of error is overruled.

We are unable to see how the testimony of Bishop Morris, to the effect that he did not remember whether he or his counsel (Mr. Smith) signed his answer to the bill filed in the chancery court to construe Bishop Farrelly's will, was of any materiality or probative consequence in this case, and the thirty-first assignment of error is overruled.

This disposes of all the assignments of error. It results that the judgment of the circuit court is affirmed, and a proper judgment will be entered accordingly. The costs of the appeal will be adjudged against the proponent Jos. T. Howell, Executor, etc., and the surety on his appeal bond.

Crownover and DeWitt, JJ., concur.